STATE of Utah, Plaintiff and
Respondent,

v.

Arthur Gary **BISHOP**, Defendant
and Appellant.

No. 19907.

Supreme Court of Utah.

Feb. 3, 1988.

Rehearing Denied Feb. 24, 1988.

**440**

Jo Carol Nesset–Sale and Curtis Nesset, Salt Lake City, for defendant and appellant.

David L. Wilkinson and David B. Thompson, Salt Lake City, for plaintiff and respondent.

HALL, Chief Justice:

Defendant was convicted of five counts of first degree murder, Utah Code Ann. § 76–5–202 (1978 & Supp.1983) (amended 1984 & 1985); five counts of aggravated kidnapping, Utah Code Ann. § 76–5–302 (1978 & Supp.1987); and one count of aggravated sexual abuse of a child, Utah Code Ann. § 76–5–404.1 (Supp.1983) (amended 1984). After a penalty hearing, the jury returned verdicts of death on all of the murder convictions. The trial court also imposed five consecutive sentences of five years to life for each of the aggravated kidnapping convictions, two of which have ten-year minimum mandatory terms, and sentenced defendant to five years to life, with a six-year minimum mandatory term on the sexual abuse of a child conviction. Defendant's nineteen-point brief raises over forty arguments on appeal.

## I. FACTS

Between October 16, 1979, and July 14, 1983, Alonzo Daniels (aged 14), Claude (Kim) Peterson (aged 11), Danny Davis (aged 4), Troy Ward (aged 6), and Graeme Cunningham (aged 13) disappeared and were never seen alive again. Prior to Cunningham's July 14, 1983 disappearance, he had been planning a trip to California with a friend, minor J.H., and defendant.

During the afternoon of July 24, 1983, J.H. and defendant stopped at Cunningham's home, and the police arrived shortly thereafter. A police officer drove J.H. to the police station; defendant followed in his car. At the station, the officers questioned defendant in a formal interview about Cunningham's whereabouts. For approximately the first hour of the interview, defendant gave no helpful information. Defendant then turned off a tape recorder being used to record the interview and stated that he did not want to talk anymore and that he wanted a lawyer. However, after going to the restroom and being told that he was going to jail, defendant indicated that he wished to continue. Shortly thereafter, defendant suggested that the officers accompany him to his house to find some items of interest. At his residence, defendant produced a revolver and over 400 photographs of nude boys.

Upon returning to the police station, defendant gave the officers a confession detailing the abduction and murder of the five missing youths. Defendant then directed the officers to locations in Big Cottonwood Canyon and Cedar Fort, Utah, where the boys' bodies were eventually recovered. Other pertinent facts are discussed in conjunction with the issues below.

## II. VOIR DIRE

Defendant's first point is that the trial court erred during voir dire. Defendant's two-fold argument initially attacks the questioning of panel member Walker and then challenges the voir dire as a whole.

### A

Defendant claims that the trial court interfered during questioning of Walker by unnecessarily limiting defense questions and by interrupting and allegedly "rehabilitating" Walker just as she "seemed" about to make biased statements. Defendant contends that this interference effectively foreclosed a challenge for cause and forced him to exercise a peremptory challenge to remove her from the jury panel. Defendant relies upon the following excerpts from the record to support his claim of interruptions and alleged rehabilitation:

Q [by defense counsel] Would you ever impose—vote to impose a death penalty if there were a conviction on capital

homicide because you believed somebody expected it of you?

A No.

Q So it wouldn't matter if you believe the prosecutor expected you—

The Court: I won't let you go into that.

Q [by defense counsel] You have told Judge Banks that you believe in the death penalty. Why do you believe in it?

A I just do.

Q Can you—you must have some reasons, I assume, supporting that belief.

A Well, I think if anybody has killed somebody and it's been proven, I just believe that—in the death penalty.

Q But you do understand that some offenses, some kinds of homicides, don't allow you to impose a death penalty?

A Well, yes.

Q Is that a conflict for you?

A Yes, in a way. Yes.

Q How is it a conflict?

A Oh, I don't know. In general.

Q Pardon.

A In general. I mean, just I have different feelings. I mean, like I say, I just believe it.

The Court: Let me put this question to you: If at the guilt phase, if it goes to that phase, you are not satisfied in your own mind the state has shown that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt and further that you aren't convinced in your own mind that the death penalty was the only appropriate penalty for Mr. Bishop, would you vote for the life sentence and not the death penalty?

Ms. Walker: Life.

The Court: All right.

. . . .

Q [by defense counsel] If it's proven to you that Mr. Bishop killed a child, does that then justify the death penalty?

A No. I mean—yes.

Q Okay.

The Court: You see, at the guilt phase, you had already determined that he did take the life of a child. Under some circumstances, can you see where a life sentence would be appropriate over death, under some circumstances?

Ms. Walker: Under some—if—yes, yes.

The Court: All right.

Q [by defense counsel] What are those kinds of circumstances?

A Well, if he was really sick or—well, you know, did have a mental problem and that or whatever, yes.

Briefed instances where the court limited questioning of Walker follow:

Q [by defense counsel] Do you believe there is any relationship between what a victim may have suffered and what the perpetrator of the crime should suffer?

The Court: I won't allow that question.

Q [by defense counsel] Do you believe that the most important thing you can teach your children is respect for law and order?

A Yes.

Q The most important thing?

A Well, yes.

Q Okay. In addition to that, what do you think the two or three most important aspects of being a parent are?

The Court: I'm not going to allow that to go in there.

Q [by defense counsel] If a person were to be convicted of first-degree murder, what kind of information would you like to know about him?

The Court: I won't allow that question in.

Q [by defense counsel] What would be your feelings about participating in a jury whose function is to try a capital homicide case where if the person is convicted you will have to consider imposition of the death sentence?

A My feeling?

Q Yes.

A I'm not very good.

Q Why not?

A I don't know; I don't know.

Q I mean, are these feelings of nervousness?

A Yes, yes.

Q Because of the enormity of the responsibility?

A No, not that. I just think—that having a boy the same age and that, I mean, it just—I just have feelings.

Q You do have one son?

A Yes.

Q What are the feelings that you have because they were boys that were killed?

The Court: No. I am not going to allow any further probing into that.

. . . .

Q [by defense counsel] Do you believe that people can become better persons over time and can change?

The Court: I don't think that's appropriate.

. . . .

Q [by defense counsel] In your own mind, in any particular case, would you need to know in that case the purpose [of the death penalty]?

The Court: I don't think the purpose is appropriate. If they believe in it, yes. And when you are asking them about the legislature, that's what the legislature has done, so that has to be accepted as the law.

■ An accused has a right to a fair trial by an impartial jury.[1] The broad discretion afforded trial courts in seating fair, impartial jurors extends to the scope of voir dire questioning:[2]

The court *may* permit counsel or the defendant to conduct the examination of the prospective jurors or *may* itself conduct the examination. In the latter event, the court *may* permit counsel or the defendant to supplement the examination by such further inquiry as it deems proper, or *may* itself submit to the prospective jurors additional questions requested by counsel or the defendant.[3]

■ Voir dire provides the means for detecting juror prejudice or bias, thereby enabling counsel to intelligently challenge such persons.[4] Accordingly, sufficient latitude in the questioning process must be given to preserve the right to a fair trial.[5] It follows that whether the trial court abused its discretion in conducting voir dire turns on whether, considering the totality of the questioning, counsel was afforded an adequate opportunity to gain the information necessary to evaluate jurors.[6]

■ On appeal, an appellant has the burden of establishing that reversible error resulted from an abuse of discretion. Beyond unsupported claims, defendant has not begun to establish that the court's interruptions and questioning significantly deprived him of the opportunity to discover information relevant to Walker's fitness for jury service. The record reveals due diligence on the part of the trial court to secure an impartial jury.

During the course of voir dire, the trial court explained to counsel that the purpose of its conduct was two-fold: First, it explained that the interruptions and clarifications were necessary so the jury could understand the import of counsel's questions. The judge said: "But you see, it's unfair on some of these [questions] because they don't understand it because they haven't been instructed as to what they are going to have to consider on these things. We have touched on it, but we haven't clearly instructed them on it. And that's the difficulties we're having." At another point, the trial judge stated, "The difficulty is, you see, they haven't received the benefit of all the instructions as to the law of the

**1.** U.S. Const. Amends. V, VI; Utah Const. art. I, §§ 7, 10, 12; Utah R.Crim.P. 17(c).

**2.** *See State v. Hewitt,* 689 P.2d 22, 25 (Utah 1984); *State v. Lacey,* 665 P.2d 1311, 1312 (Utah 1983) (per curiam).

**3.** Utah R.Crim.P. 18(b) (emphasis added).

**4.** *State v. Ball,* 685 P.2d 1055, 1058–60 (Utah 1984).

**5.** *See id.* at 1060.

**6.** *See Bolhouse v. State,* 687 P.2d 1166, 1172 (Alaska Ct.App.1984).

case."[7] The court was simply trying to assist juror understanding such that their answers would be meaningful.

Second, the court explained the importance of determining whether a juror could be easily swayed during voir dire.[8] Indeed, at one point during voir dire, defendant objected to the court's interrupting and asking leading questions of panel member Newman. After the woman left the jury room, the court explained: "I just wanted the reason [on the record]. It's apparent to the court she wouldn't follow the court's instructions. She is stricken for cause." The court's interruptions and questions did not constitute an abuse of discretion. The court was simply fulfilling its duty to seat a fair and impartial jury.

■ Defendant's contention that he was prejudiced by the trial court's limitations on questioning is unpersuasive. The only significant limitation was the court's restriction on questioning Ms. Walker concerning what effect child victims would have on her decision. Defendant argues that such a limitation was egregious because the woman had a young son similar in age to the ages of the victims. As an initial matter, the transcript reveals that Ms. Walker was a widow with three children. Their ages at the time of trial were 27, 29, and 32. In any event, defense counsel was given the opportunity to question Walker on the matter. Prior to Walker's statement about "having a boy the same age" and defense counsel's question concerning child victims, the following exchange took place between counsel and Ms. Walker:

Q [by defense counsel] In this case, you have been informed that the victims are all children. Does your attitude about the death penalty—is your attitude on the death penalty affected as to whether it's appropriate in a case or not if children are victims rather than adults?

A Well, I don't believe a person is guilty until they are proven innocent—I feel, no way. I mean, nothing.

Q I understand that. But if we have a case where you were going to have to consider penalty, life or death, and the homicides were the deaths of children, would you be able to listen to all of the factors in mitigation against the death penalty or in aggravation of the death penalty, or would the fact that the children were victims make it mandatory for you that a death sentence and not life be imposed.

A No, no.[9]

After Walker and four other panel members were questioned, defendant objected to the court's proscription of the child victim question, and the court agreed that counsel could ask the following question: "Since I note on your sheet that you have children the same age or in the same age category as the victims, would that in and of itself make you unable to sit as a fair and impartial juror in this case?" Notwithstanding this ruling, counsel never again requested to put the question to Walker, despite the fact that at the conclusion of individual voir dire, the court asked counsel if there were any other questions they wanted to put to the jury. These facts convince us that defendant was not prejudiced by the court's rulings.

### B

Defendant also objects to the handling of the voir dire as a whole. He first com-

7. In response to yet another objection by counsel, the trial judge stated: "The reason for that is, you see, they had no idea that they had to hear mitigating circumstances. They had not heard those factors, so that should be explained to them as to what they were called upon to hear."

8. Specifically, the court stated, "So I don't want anyone, and particularly this defendant, to feel because I might ask a leading and suggestive question—that's important to you to see if that juror could be swayed very easily. So that's the purpose of it. And there's no ulterior motive on the part of the court. I want that firmly understood."

9. Additionally, prior to individual voir dire the court asked the panel members as a whole to raise their hands if the death of a young child or the manner in which he died made it difficult to serve on the jury. Ms. Walker did not raise her hand.

plains in a footnote that the trial court improperly prevented defense counsel from questioning the panel about

> [t]he relationship between the death penalty and Christianity; whether a life sentence could accomplish the goal of preventing crime in the same way as the death penalty; ... whether questioning jurors about the death penalty raises doubts as to defendant's guilt [sic]; what "brutality" meant in [the] context of [a] potential juror's statement that [the] death penalty should be imposed where "brutality" [is] involved; [and] how the potential juror defined "aggravation" and "mitigation."

Defendant has failed, as to all but one of these claims, to either cite to the record where the alleged actions occurred or provide any authority or argument as to why such actions constituted reversible error. As has been aptly stated by another court, "[A] reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository in which the appealing party may dump the burden of argument and research." [10]

■ Nevertheless, although defendant has not adequately raised and briefed these issues on appeal, we have reviewed the record and find no manifest and prejudicial error.[11] Indeed, much of what is objected to is not reflected by the record. At defense counsel's request, the court queried the entire panel as to which of them regularly attended church, and while the court may not have allowed counsel to probe during general voir dire into the relationship between the panel members' religious viewpoints and capital punishment, it explained to counsel that the jurors' attitudes on the death penalty would be examined thoroughly during individual voir dire. Moreover, the court later ruled that questions concerning conflict between a juror's religious views or Christianity and the death penalty could be asked during individual voir dire. Subsequently, counsel asked several jurors during individual voir dire, without interruption or objection, whether they felt that any conflict existed between their religious views and the death penalty. Others volunteered the information. Most jurors were not asked the question. Defendant's contention that the trial judge refused to allow questioning of jurors concerning possible conflicts between religious views and capital punishment is simply without basis.[12]

■ Similarly, the trial court permitted defense counsel to ask panel members in substance whether they believed that a life sentence could accomplish the goal of preventing crime in the same way as the death penalty. Only when Mr. Bentley was asked the question did the court interpose and not allow elaboration. Yet, Bentley had already stated that in his view, a life sentence was not as serious as a death sentence. He had also explained why he thought the death penalty was an appropriate penalty. Given these answers and the lack of analysis by counsel on appeal, we fail to see how the judge's "limitation" on the questioning was an abuse of discretion.

■ The same analysis holds true concerning defendant's argument that the trial court erred by allegedly refusing to allow defense counsel to ask panel members whether the court's questions about the death penalty raised doubts about defendant's innocence. The trial court instructed the panel on the presumption of innocence, and the panel members responded that they would afford defendant the presumption and follow the judge's instructions on the law. The trial judge later allowed the question to be posed.

As to the other two questions at issue, they involved isolated incidents which, when viewed in context, do not constitute an abuse of discretion since ample informa-

**10.** *Williamson v. Opsahl,* 92 Ill.App.3d 1087, 1089, 48 Ill.Dec. 510, 511, 416 N.E.2d 783, 784 (1981); *see also State v. Olmos,* 712 P.2d 287, 287 (Utah 1986) and cases cited therein; R. Utah S.Ct. 24(a)(7) (1987).

**11.** *See State v. Tillman,* 750 P.2d 546, 551–53 (Utah 1987) (plurality opinion) *reh'g denied; cf. infra* note 230 and accompanying text.

**12.** *See State v. Lafferty,* 749 P.2d 1239, 1251–52 (Utah 1988).

tion about the two or three panel members in question was obtained by counsel, thus enabling counsel to evaluate their qualifications for being impartial jurors.

Defendant also contends that the court asked intimidating questions whenever a panel member responded in a manner unacceptable to the court, but defendant has failed to indicate where such questioning occurred. A careful review of the record discloses that this contention is without basis.

Defendant finally contends that the court erred by asking during general voir dire certain questions proposed for individual voir dire, by refusing to ask other probative questions, and by asking leading questions. In general, these concerns were addressed hereinabove. We also observe that the substance of many of counsels' proposed questions was asked in the form of other questions. As in *State v. Hillstrom*,[13] the trial court allowed great latitude in questioning.[14]

In terms of the standard set forth above, we have reviewed the voir dire of Ms. Walker and the panel as a whole and conclude that ample latitude in questioning the panel was permitted so counsel could intelligently exercise challenges.

## III. CHALLENGES FOR CAUSE

Defendant's second point is that the trial court erred by not granting challenges for cause lodged against at least three jury panel members: Harmon, Price, and Filip. Defendant expended peremptory challenges to have those jurors removed from the panel and, during the course of the jury selection process, exercised all of his peremptories.

It is prejudicial error to compel a party to exercise a peremptory challenge to remove a panel member who should have been removed for cause.[15] Thus, we must determine whether the trial court abused its discretion by refusing to remove Harmon, Price, and Filip.

Rule 18(e)(13) of the Utah Rules of Criminal Procedure allows a challenge for cause to be taken where a juror has "formed or expressed an unqualified opinion or belief as to whether the defendant is guilty or not guilty." And, of course, a juror must be willing to apply the law as instructed by the court.[16] These principles are implicit in rule 18(e)(14) of the Utah Rules of Criminal Procedure, which provides in part that a challenge for cause is proper where "a state of mind exists on the part of the juror with reference to the cause, or to either party, which will prevent him from acting impartially and without prejudice to the substantial rights of the party challenging [the juror]." "Impartiality" has been defined as a mental attitude of appropriate indifference.[17]

■ Once comments are made which facially raise a question of partiality or prejudice, an abuse of discretion occurs unless the challenged juror is removed by the court or unless the court or counsel investigates further and finds the inference rebutted; rebuttal of such an inference may be accomplished by a showing that the statement was merely the product of a "light impression" and not one that would "close the mind against the testimony that may be offered in opposition."[18]

■ In the case at hand, defendant contends that Harmon's voir dire showed he would be unable to weigh mitigating circumstances where more than one death was involved. Harmon stated that in his opinion a death sentence would not always be appropriate. However, when asked whether his opinion would be different where multiple murders were involved, he responded in part, "I would think his life should be taken." When asked whether

---

**13.** 46 Utah 341, 150 P. 935 (1915).

**14.** *See id.* at 368–69, 150 P. at 946.

**15.** *E.g., Lacey,* 665 P.2d at 1312.

**16.** Utah R.Crim.P. 18(i).

**17.** *State v. Brooks,* 563 P.2d 799, 801 (Utah 1977).

**18.** *State v. Bailey,* 605 P.2d 765, 768 (Utah 1980); see *State v. Brooks,* 631 P.2d 878, 884 (Utah 1981).

anything "good about the individual" might temper his decision to impose the death penalty, he responded in part that he would impose it on his own son if he (the son) had committed the alleged crimes beyond a reasonable doubt. The problem is that the above questions and Harmon's answers have been taken out of context:

Q [by defense counsel] Would it be fair to say that you—in this area of justice, would you ascribe to the concept that a person who takes the life of another should pay with his own?

A Not in all cases.

Q So in some instances, justice would not require the forfeiting of a life even if the life had been taken?

A That's correct.

Q Would that, in your opinion, change if the individual was responsible for more than one death?

A Here again, I think you would have to hear all the evidence. But just—I believe that if there was more than one death involved, then I would think that his life should be taken or her life or whoever.

Q ... But let's just assume ... that you were satisfied beyond a reasonable doubt that Mr. Bishop was responsible for one or up to five of the deaths of the boys ranging in age from four years old to thirteen years old.

Do you believe that, then, the only penalty that would be appropriate would be death?

A If I had heard all the evidence and I had been explained from the court that the death penalty was appropriate in this case, yes, I would.

The following examination also transpired:

Q [by the prosecution] Mr. Harmon, if the jury were to find the defendant guilty of one or more of these capital crimes and you were on the jury and went to the sentencing phase and if the court instructed you that the mere fact that you had found him guilty of one or more of these crimes was not enough to vote for the death penalty but you had to weigh the aggravating circumstances and the mitigating circumstances and then make your decision, could you follow that instruction?

A Yes, sir, I could.

. . . .

Q [by defense counsel] Mr. Harmon, could you reserve that type of judgment until after all the evidence was presented? Could you do that?

A I have not made a judgment thus far and I won't until that time.

Q You know that, based upon the prosecutor's question, what he is stating to you is that if, indeed, you find Mr. Bishop committed these offenses under certain aggravating circumstances, then you would have found that he did it and that it was a capital offense. But your job won't be over.

A I understand.

Q Then you would have to go into a penalty phase and determine whether or not the death penalty was proven to you beyond a reasonable doubt and that it was the only appropriate penalty in this case. Could you reserve your judgment from the guilt phase to the penalty phase?

A Yes, sir.

Review of Harmon's answers to counsels' questions reflects that he was willing to keep an open mind and apply the law as the court instructed. Approval of the death penalty is not legal partiality,[19] and we do not believe that Harmon's statements, when taken in context, reveal that he would automatically apply the death penalty. And even if some of Harmon's statements can be read as facially raising a question of impartiality, subsequent questioning by counsel cleared up any doubts concerning Harmon's ability to be an impartial juror. We therefore conclude that the court did not err in refusing to remove Harmon.

**19.** *Lafferty,* 749 P.2d at 1252–53; *State v. Norton,* 675 P.2d 577, 589 (Utah 1983), *cert. denied,* 466 U.S. 942, 104 S.Ct. 1923, 80 L.Ed.2d 470 (1984), *overruled on other grounds, State v. Hansen,* 734 P.2d 421, 427 (Utah 1986); *see also infra* note 22 and accompanying text.

In response to the trial court's questioning, Price stated that upon a defendant's conviction for first degree murder, he could impose a life sentence under certain circumstances, but it was not likely. He also stated that he did not feel the death penalty was imposed often enough. Defendant thus contends that Price's answers revealed an impermissible presumption in favor of execution. However, when Price's dialogue with the court and counsel is read in context, it is apparent that no such presumption existed in his mind:

The Court: And could you impose a life sentence rather than death under a given circumstance?

Mr. Price: Yes, definitely.

The Court: And could you do that even though you had determined the defendant guilty of murder in the first degree? Could you still feel that you could impose a life sentence under certain circumstances?

Mr. Price: Probably under certain circumstances, but not likely.

. . . .

Q [by the prosecution] If we get to a sentencing phase, the court will instruct you that even though you have found the defendant guilty of capital punishment—

The Court: Guilty of a capital offense.

. . . .

Q —of a capital offense, before you can decide whether to give life or death, you have to follow certain standards. Now, would you be able to follow those standards, or would you automatically vote for the death penalty?

A I don't know what the standards would be, you know, so I really don't feel I could answer that.

Q If you were told the standards would be that you would have to weigh aggravating circumstances against the mitigating circumstances and before you could find for death, you would have to find that those aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt and that the death penalty was appropriate in the case beyond a reasonable doubt—

Now, my question is: would you follow those standards, or would you go automatically and vote for the death penalty?

A If the court so desired, then definitely, I would follow their instructions.

Q And if after following those instructions you felt that the death penalty was not appropriate, would you be able to vote for life?

A Certainly.

. . . .

Q [by defense counsel] Are there some kinds of cases, Mr. Price, that you think always require the death penalty?

A That's a tough one. No, I don't think so.

. . . .

Q You said that it would—if, in this case, you had already been part of the jury that had found Mr. Bishop guilty of a capital offense of homicides plus some aggravating circumstances like kidnapping, you had already decided that and returned that verdict, that it would not be likely that you could impose a life sentence. What makes you say that?

A Like I say, I am for capital punishment and death penalty. And I don't think the state or the country, for that matter, imposes it enough. That's my personal feeling.

Although Price stated that it was unlikely he would impose a life sentence on a defendant accused of first degree murder, as can be clearly seen, this opinion was not unqualified; he indicated that circumstances existed where a life sentence would be appropriate. The fact that a juror is "strong for the death penalty," as was noted by the court, is not sufficient cause for his removal.[20] As was stated in *Witherspoon v. Illinois*,[21] "A man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a

---

**20.** *See supra* note 19.

**21.** 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

juror." [22] We do not believe Price manifested that he would presumptively vote to impose the death penalty. We so hold despite defendant's contention that Price volunteered that capital punishment *should* have been imposed in other capital cases. Price stated: "Of course, I wasn't a juror and I don't know what took place. But my personal feeling is that life shouldn't have been imposed on them."

Even assuming that his statement did facially raise an inference of impartiality, it was rebutted by subsequent questioning. When asked by the prosecution whether he would automatically vote for the death penalty or follow "certain standards," Price indicated that he did not know what standards he would be expected to follow, that he would follow the court's instructions, and that if pursuant thereto life was appropriate, he would vote to impose a life sentence. Mr. Price then again indicated that not all such cases call for the death penalty.

■ Similarly, we find no merit in defendant's contention that Price should have been excused for forming an opinion of guilt. Rule 18(e)(14) of the Utah Rules of Criminal Procedure provides, in pertinent part:

> [N]o person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon public rumor, statements in public journals or common notoriety, if it satisfactorily appears to the court that the juror can and will, notwithstanding such opinion, act impartially and fairly upon the matter to be submitted to him.

Defense counsel queried as follows:

Q How is it that you are so easily able to set aside and ignore your own feelings that you have already expressed and an opinion you formed concerning Mr. Bishop's guilt?

A Say that once more, please.

Q How is it that you are able to say that, I formed an opinion of guilt, but I could easily set that aside? How are you able to—

The Court: And base his guilt or innocence on the evidence introduced.

Mr. Price: Well, I might add that most of my friends are in police work.

Q [by defense counsel] Yes.

A And just roughly talking, them not knowing circumstances, you know, how a bunch of fellows will make the—say what should happen to an individual that commits crimes of those natures, you know.

And that's how I have expressed an opinion in the matter. And I do in any matter, such as that.

Q So are you telling me that you have sort of jumped to some conclusions in forming that opinion?

A Definitely, yes.

Q And therefore, it would be easy to set aside?

A Oh, yes, surely.

Price not only said that he could set his opinion aside, but also noted that it was based upon the type of common notoriety expressly mentioned in rule 18(e)(14). Thus, Price did not have an "unqualified opinion" under rule 18(e)(13). Price's testimony does not, as claimed by defendant, exhibit any prejudice against him. Price inferred that his statements were based on "light impressions" which he could easily set aside. Moreover, at the conclusion of the individual voir dire all of the panel members were asked whether they could and would set aside any opinions they had. Price indicated that he would.

■ Finally, Filip stated that it would require a strong argument for her not to sentence to death a defendant responsible for five murders. Defendant challenged the juror on the bases that she believed the death penalty would be the only appropriate penalty and that defendant would have the burden to negate this feeling. However, Filip further stated:

Q [by the prosecution] Mrs. Filip, if you found after deliberation in the guilt phase beyond a reasonable doubt that

---

**22.** *Id.* at 519, 88 S.Ct. at 1775.

Mr. Bishop was guilty of the five capital crimes, would you in the sentencing phase automatically vote for death, or would you listen to the evidence and make a weighing of any mitigating circumstances against the aggravating circumstances?

A I wouldn't automatically vote for a death sentence. I think that would be a very difficult thing to do. I would listen to what was said.

. . . .

Q And do you realize even in the sentencing phase the burden is upon the State to prove that this person—from the evidence, that the death penalty would be appropriate? The burden is on the State still.

A Yes, yes.

Filip's answers, when taken in context, clearly indicate that she would follow the court's instructions and keep a fair and open mind when considering the testimony at trial. We are convinced that the trial court did not abuse its discretion in not dismissing Filip for cause.

We have also reviewed the record concerning the selection of the other panel members challenged for cause and determine that in none of those cases did the court abuse its discretion.

## IV. CONSTITUTIONALITY OF ALLOWING TEN PEREMPTORY CHALLENGES

■ Defendant's third point is that the lower court erred by not declaring rule 18(d) of the Utah Rules of Criminal Procedure unconstitutional. That provision allows the prosecution and the defense ten peremptory challenges each in capital felony cases. The contention is that allowing the prosecution to exercise ten peremptory challenges against a death-qualified jury in a pro-death-penalty state results in a "conviction-prone" and "death-prone" jury in violation of a defendant's constitutional rights.

Defendant's tri-part argument rests upon, first, the death qualification of the panel; second, a survey of registered voters from Salt Lake County which, defendant claims, demonstrates pro-death-penalty attitudes on the part of Utahns; and third, the ten peremptories allowed by rule 18(d). It is the effect of these three components' operating upon one another that defendant claims causes rule 18(d) to be infirm.

The sixth amendment to the United States Constitution guarantees an accused a trial by an impartial jury.[23] Selection of petit juries from a representative cross-section of the community is an essential component of this guarantee.[24]

Death qualification of a jury involves the identification and removal for cause of those panel members whose views on capital punishment prevent or substantially impair the performance of their duties in accordance with the "jurors' oath" and the court's instructions.[25] And under Utah law, those panel members who would always vote for the death penalty upon conviction of first degree murder are also excludable.[26]

Defendant relies on footnote 18 in *Witherspoon v. Illinois*,[27] which indicates that a defendant might establish that a death-qualified jury was less than neutral with respect to guilt.[28] However, this argument has been laid to rest.

In *Lockhart v. McCree*,[29] the defendant had been convicted of capital felony mur-

---

23. *Duncan v. Louisiana*, 391 U.S. 145, 148, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491 (1968); *see also supra* note 1.

24. *Taylor v. Louisiana*, 419 U.S. 522, 528, 95 S.Ct. 692, 696, 42 L.Ed.2d 690 (1975); *State v. Bankhead*, 727 P.2d 216, 217 (Utah 1986) (per curiam).

25. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); *Lafferty*, 749 P.2d at 1253; *State v. Moore*, 697 P.2d 233,

237 (Utah 1985); *Norton*, 675 P.2d at 589; *see also* Utah R.Crim.P. 18(e)(10).

26. *Norton*, 675 P.2d at 589.

27. 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776.

28. *Id.* at 520 n. 18, 88 S.Ct. at 1776 n. 18.

29. 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).

der and was sentenced to life without possibility of parole. Prior to the guilt phase of the defendant's bifurcated trial, the judge removed for cause those prospective jurors who stated that they could not under any circumstances vote for imposition of the death penalty.[30] The defendant subsequently filed a habeas corpus petition, claiming *inter alia* that removal of the jurors violated his sixth and fourteenth amendment rights to have his guilt or innocence determined by an impartial jury selected from a representative cross-section of the community.

In *Lockhart,* the United States Supreme Court reversed an Eighth Circuit opinion upholding the district court's decision that had granted the defendant's petition. The Supreme Court held that the United States Constitution does not prohibit the removal for cause, prior to the guilt phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of trial.[31] The decision dealt with both the fair cross-section and impartiality guarantees of the sixth and fourteenth amendments.[32]

This Court has previously considered the point and came to the same conclusion in *State v. Lafferty,*[33] *State v. Moore,*[34] and *State v. Schreuder.*[35]

Defendant claims, however, that the death-qualification process allowed identification by the prosecution of neutral or "death penalty scrupled" panel members who were then excluded with peremptory challenges by the prosecution. In *Lock-*

*hart,* the United States Supreme Court said:

We would in any event reject the argument that the very process of questioning prospective jurors at voir dire about their views of the death penalty violates the Constitution. McCree concedes that the State may challenge for cause prospective jurors whose opposition to the death penalty is so strong that it would prevent them from impartially determining a capital defendant's guilt or innocence. Ipso facto, the State must be given the opportunity to identify such prospective jurors by questioning them at voir dire about their views of the death penalty.[36]

We therefore conclude that the first aspect of defendant's argument fails and that this failure wholly undermines his attack on rule 18(d). Yet, even assuming *arguendo* that the first aspect of defendant's argument had some merit, his point on appeal still must fail.

Defendant relies on *Batson v. Kentucky*[37] in support of his claim that the State's exercise of its peremptory challenges is reviewable on appeal. He contends that the prosecution should not be allowed to use peremptory challenges to remove all individuals who entertain "scruples" against imposition of the death penalty, and amidst much ambiguity, he appears to claim that this violates the fair-cross-section component of the sixth amendment. However, *Batson* expressly declined to address the fair-cross-section challenge to the discriminatory use of peremptory challenges.[38] And in *Lockhart,* the Court noted that it had never invoked the fair-cross-section principle to invalidate the use of either for-cause or peremptory challenges

---

**30.** *Id.* at 166, 106 S.Ct. at 1761.

**31.** *Id.* at 165, 106 S.Ct. at 1760.

**32.** Since we hold that *Lockhart* effectively refutes this aspect of defendant's argument, we rest this part of our decision on its holding. We are not intimating any view on whether a defendant has standing to rely on *Witherspoon* where no panel members are improperly removed pursuant to its holding. *See Wainwright,* 469 U.S. at 423, 105 S.Ct. at 852.

**33.** 749 P.2d at 1253.

**34.** 697 P.2d at 237.

**35.** 726 P.2d 1215, 1225–26 (Utah 1986) (plurality opinion).

**36.** 476 U.S. at 170 n. 7, 106 S.Ct. at 1763 n. 7.

**37.** 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

**38.** *Id.* at 84 n. 4, 106 S.Ct. at 1716 n. 4.

to prospective jurors or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large.[39] That Court concluded that an extension of the fair-cross-section requirement to petit juries would be unworkable and unsound.[40] The Court, instead of stopping there, held, assuming *arguendo* that such a constitutional requirement did exist, that "groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors, such as the '*Witherspoon*-excludables' ... are not 'distinctive groups' for fair cross section purposes." [41]

Finally, the survey relied on by defendant is not particularly persuasive and is far from the type of evidence this Court needs before striking legislative enactments.[42]

## V. COMPOSITION OF THE JURY

■ Defendant's fourth point is that he was denied his right to trial by a jury chosen from a fair cross-section of the community. Before the jury was sworn, defendant moved to quash the panel on the ground that using voter registration lists as the sole source of jurors in Salt Lake County violated his rights under the sixth amendment to the United States Constitution. The motion was denied. On appeal, defendant again raises the issue, contending that the use of voter registration lists as the exclusive source of jurors leads to the systematic underrepresentation of racial and ethnic minorities, particularly Hispanics, on panels in Salt Lake County.

In *State v. Tillman*,[43] defendant Tillman raised this issue for the first time on appeal by incorporating the record evidence and argument from this case. In *Tillman*, we addressed the issue both as to defendant Tillman and defendant Bishop, and we concluded that the point was without merit.[44]

## VI. CHANGE OF VENUE AND SEQUESTRATION OF THE JURY

■ Defendant's fifth point is that the trial court violated his constitutional rights by denying his motion for a change of venue.

In January 1984, defendant filed a motion for a change of venue pursuant to rule 29(e) of the Utah Rules of Criminal Procedure.[45] Defendant's motion was premised

---

**39.** 476 U.S. at 173, 106 S.Ct. at 1764.

**40.** *Id.* at 174, 106 S.Ct. at 1765.

**41.** *Id.* The Court continued: "In sum, '*Witherspoon*-excludables,' or for that matter any other group defined solely in terms of shared attitudes that render members of the group unable to serve as jurors in a particular case, may be excluded from jury service without contravening any of the basic objectives of the fair cross-section requirement." *Id.* at 176–77, 106 S.Ct. at 1766. Despite the broad language in *Lockhart*, it has been held that peremptory challenges may be challenged under the sixth amendment. In *McCray v. Abrams*, 750 F.2d 1113, 1129–30 (2d Cir.1984), *vacated*, 478 U.S. 1001, 106 S.Ct. 3289, 92 L.Ed.2d 705 (1986), the Second Circuit held that in certain circumstances, the use of peremptory challenges to strike *jurors of a particular race* may violate a defendant's sixth amendment right to be tried by an impartial jury drawn from a fair cross-section of the community. 750 F.2d at 1131. The Second Circuit recently upheld *McCray's* reasoning despite *Lockhart's* broad language. *Roman v. Abrams*, 822 F.2d 214, 226 (2d Cir.1987); *see also Lockhart*, 476 U.S. at 193 n. 6, 106 S.Ct. at 1775 n. 6 (Marshall, J., dissenting).

In passing, we note that defendant has not argued his point in terms of the equal protection analysis discussed in *Batson* or its underlying cases. *Cf. infra* note 230 and accompanying text. Indeed, on the record before us, such a challenge could not be made successfully.

**42.** *See Lockhart*, 476 U.S. at 171, 106 S.Ct. at 1763.

**43.** 750 P.2d 546.

**44.** *Id.* at 573–77; *see also State v. Valdez*, 748 P.2d 1050, 1057–58 (Utah 1987).

**45.** The rule provides:
 If the prosecution or a defendant in a criminal action believes that a fair and impartial trial cannot be had in the jurisdiction where the action is pending, either may, by motion, supported by an affidavit setting forth facts, ask to have the trial of the case transferred to another jurisdiction.
 If the court is satisfied that the representations made in the affidavit are true and justify transfer of the case, the court shall enter an order for the removal of the case to the court of another jurisdiction free from such objection and all records pertaining to the case shall be transferred forthwith to the court in

upon a claim that he could not receive a fair trial in Salt Lake County because of public sentiment against him and due to the extensive media coverage of the events surrounding the case. By defendant's own choice, a hearing on this motion was not had until after voir dire had been completed. The motion was subsequently denied.

Defendant relies upon *Rideau v. Louisiana*,[46] *Estes v. Texas*,[47] and *Sheppard v. Maxwell*[48] to support his argument that pretrial publicity in this case was so massive and prejudicial that his trial inherently lacked due process. In *Rideau*, the United States Supreme Court reversed the conviction of a defendant whose staged and highly emotional confession had been filmed with the cooperation of the police and then broadcasted on television for three days while he was awaiting trial.[49] In so holding, the Court said, "[S]ubsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality."[50] Similarly, in *Estes*, the Court reversed a conviction where the "volume of trial publicity, the judge's failure to control the proceedings, and the telecast of a hearing and of the trial itself 'inherently prevented a sober search for the truth.' "[51] Finally, in *Sheppard*, the Court reversed the defendant's conviction after relating for several pages perhaps the most egregious pretrial and trial publicity ever reported, which, in the Court's own words, led to a "carnival atmosphere at trial" that could have been prevented by the trial court.[52]

After reviewing the record, we hold without reservation that the publicity and attendant circumstances in this case did not amount to "one of those exceptional cases where pretrial publicity exacerbated by State complicity encouraged the jurors to form such strong preconceived views of the defendant's guilt as to be considered inherently prejudicial against him."[53]

Because we hold that pretrial publicity and community sentiment did not inevitably lead to an unfair trial, defendant may prevail on his point only if he demonstrates that the trial was not fundamentally fair.[54] We begin with the proposition that whether a motion for a change of venue should be granted rests within the sound discretion of the trial court.[55] The standard used to determine if an abuse of discretion has resulted is whether the defendant has had "a panel of impartial, 'indifferent' jurors."[56]

The United States Supreme Court in *Irvin v. Dowd*[57] noted that qualified jurors need not be totally ignorant of the facts and issues involved.

> To hold that the mere existence of any preconceived notion as to the guilt or

---

the other county. If the court is not satisfied that the representations so made justify transfer of the case, the court shall either enter an order denying the transfer or order a formal hearing in court to resolve the matter and receive further evidence with respect to the alleged prejudice.

**46.** 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).

**47.** 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965).

**48.** 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

**49.** 373 U.S. at 724, 83 S.Ct. at 1418.

**50.** *Id.* at 726, 83 S.Ct. at 14–19.

**51.** *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 552, 96 S.Ct. 2791, 2799, 49 L.Ed.2d 683 (1976) (construing *Estes v. Texas*, 381 U.S. 532, 551, 85 S.Ct. 1628, 1637, 14 L.Ed.2d 543 (1965)).

**52.** 384 U.S. at 358, 86 S.Ct. at 1520.

**53.** *State v. Pierre*, 572 P.2d 1338, 1349 (Utah 1977), *cert. denied*, 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978).

**54.** *See Nebraska Press Ass'n*, 427 U.S. at 54, 96 S.Ct. at 554; *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975).

**55.** *See State v. Sims*, 30 Utah 2d 357, 360, 517 P.2d 1315, 1317, *cert. denied*, 417 U.S. 970, 94 S.Ct. 3175, 41 L.Ed.2d 1141 (1974); *State v. Nielson*, 25 Utah 2d 11, 12, 474 P.2d 725, 726 (1970); *State v. Gellatly*, 22 Utah 2d 149, 152, 449 P.2d 993, 995 (1969) and cases cited therein; Utah R.Crim.P. 29(e) (amended 1986).

**56.** *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); *see also Lafferty*, 749 P.2d at 1251–52.

**57.** 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751.

innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.[58]

Thus, defendant has the burden of demonstrating the existence of actual prejudice on his appeal.[59]

To demonstrate that he was actually prejudiced by pretrial publicity, defendant principally relies upon a random telephonic survey of 400 Salt Lake County voters conducted between February 13 and February 16, 1984. The survey indicates that 80 percent of the respondents stated that they believed defendant to be guilty. Additionally, 88 percent of the respondents stated that if defendant were found guilty, he should be sentenced to death. However, 71 percent felt that defendant would get a fair trial in Salt Lake County, and 76 percent indicated that they could probably or would definitely be fair jurors.

Defendant next claims that only 32 out of the 84 panel members indicated they had formed an opinion, which means if the survey accurately predicted potential juror views, the panel deviated from the community by 53 percent. Defendant argues that this gross underrepresentation of the opinionated group demonstrates that the panel was not candid during voir dire. Further, defendant claims that the discrepancy between the respondents who said they had an opinion (80 percent) and those who said they would be fair jurors (76 percent) shows that voir dire was an unreliable indicator of impartiality.

Even if we were to agree (and we do not) that 32 panel members expressed that they had an opinion, defendant's argument fails for a number of reasons. First, it is doubt-ful whether surveys such as the one in this case have any predictive value concerning qualified jurors who report for jury service.[60] Second, defendant's survey did not ask whether the respondents could set their opinions aside. Third, the trial court was free to reject the validity of the opinion poll in exercising its sound discretion.[61] Finally, defendant asserts, "The survey ... is a more objective measurement of actual prejudice than the flawed voir dire examination in which the court refused to allow the asking of crucial questions and improperly rehabilitated the venireperson [sic]." As indicated, the voir dire was not flawed.[62] And such a bald assertion of prejudice is inadequate to justify a change of venue.[63]

The test is whether any jurors were actually prejudiced against defendant. Defendant has not even begun to satisfy his burden. The only comment on the actual voir dire made by defendant is a conclusory statement that "inspection of the jury voir dire discloses that most of the prospective jurors had formed an opinion regarding Mr. Bishop's guilt."

Defendant also claims that potential jurors had read a prejudicial news article which appeared in the paper the morning of jury selection. However, only six panel members reported that they had read part or all of the article or seen the headline thereof. Of these, all but one were excused. This juror indicated that she would decide the case solely on the evidence produced at trial and would disregard the article. She said she had no opinion as to defendant's guilt. The other members of the jury also indicated that they would follow the court's instructions, and a review of their voir dire indicates that they manifested no partiality as to defendant's case. Therefore, defendant's claim that he was erroneously denied a change of venue is without merit.

58. Id. at 723, 81 S.Ct. at 1642–43.

59. *Murphy,* 421 U.S. at 800, 95 S.Ct. at 2036; *State v. Wood,* 648 P.2d 71, 88–89 (Utah 1982), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982).

60. *See supra* note 42.

61. *United States v. Haldeman,* 559 F.2d 31, 64 n. 43 (D.C.Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

62. *Supra* pp. 446–451.

63. *See Wood,* 648 P.2d at 88.

■ Defendant also contends that the trial court erred by failing to sequester the jury, but his brief does not address this issue. Moreover, our review of the record does not reveal that a motion or any argument to sequester was made by defendant. Defendant, however, has attached as an addendum to his brief affidavits in which counsel testify that a motion to sequester was presented orally to the trial judge during an unreported conference.

Even if we assume defendant made a motion to sequester, a review of the record indicates that the trial court did not abuse its discretion in denying the motion. The trial judge specifically instructed the jury not to watch television, listen to radio, read the paper, or discuss any matters which might have been relevant to the case. There is no evidence that the jury disregarded these instructions. We find defendant's claim to be without merit.[64]

## VII. CONSTITUTIONALITY OF THE DEATH PENALTY

■ In his sixth and seventh points, defendant raises several objections to the constitutionality of Utah's death penalty statutes, Utah Code Ann. §§ 76–3–206, –207 (1978 & Supp.1987). Defendant urges that we hold the statutes unconstitutional because (1) the death penalty constitutes cruel and unusual punishment, (2) the death penalty violates principles of due process and equal protection, (3) the statutes allow the jury too much discretion in determining whether to impose the death penalty because it is not instructed on how to consider aggravating and mitigating circumstances, (4) the scheme in conjunction with the first degree murder statute allows the "double counting" of aggravating circumstances in both the guilt and penalty phases of the proceedings, thus failing to narrow the class of defendants subject to the death penalty, (5) the statutory scheme allows a "de facto" shift of the burden of proof to the defendant in the penalty phase, and (6) the scheme provides for inadequate review since no written findings are made concerning the aggravating and mitigating circumstances. A review of our cases ruling on the constitutionality of the death penalty statutes, as well as an examination of the briefs underlying these decisions, indicates that in substance all these claims have been previously urged upon this Court, albeit framed at times in a slightly different fashion, and rejected.[65] The reasoning of those cases is sound, and we decline to depart from the holdings therein. Utah's death penalty scheme is constitutional and was constitutionally applied to defendant.

## VIII. SUPPRESSION OF DEFENDANT'S CONFESSION

Defendant's eighth point is that the trial court erred by denying his motion to suppress his confession. Resolution of the issue requires additional factual development.

### A

Defendant filed a pretrial motion to suppress his confession wherein he had described how he murdered the five boys. On February 9, 1984, an evidentiary hear-

---

**64.** *See State v. Easthope,* 668 P.2d 528, 532 (Utah 1983); *Codianna v. Morris,* 660 P.2d 1101, 1112 (Utah 1983).

**65.** *Tillman,* 750 P.2d at 572; *Wood,* 648 P.2d at 85; *Andrews v. Morris,* 607 P.2d 816, 823–24 (Utah), *cert. denied,* 449 U.S. 891, 101 S.Ct. 254, 66 L.Ed.2d 120 (1980); *Pierre v. Morris,* 607 P.2d 812, 814–15 (Utah), *cert. denied,* 449 U.S. 891, 101 S.Ct. 254, 66 L.Ed.2d 120 (1980); *State v. Andrews,* 574 P.2d 709, 710 (Utah 1977), *cert. denied,* 439 U.S. 882, 99 S.Ct. 220, 58 L.Ed.2d 194 (1978); *State v. Codianna,* 573 P.2d 343, 348 (Utah 1977), *cert. denied,* 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978); *Pierre,* 572 P.2d at 1345–46, 1356; *see Andrews v. Morris,* 677 P.2d 81, 83–84 (Utah 1983). Most of these claims have also been treated by the Federal District Court for the District of Utah and the Tenth Circuit Court of Appeals. *Pierre v. Shulsen,* 802 F.2d 1282, 1283 (10th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1964, 95 L.Ed.2d 536 (1987); *Andrews v. Shulsen,* 802 F.2d 1256, 1261–62 (10th Cir.1986), *cert. denied,* —— U.S. ——, 108 S.Ct. 1091 (1988) (No. 87–5449); *Andrews v. Shulsen,* 600 F.Supp. 408, 422–24, 431 (D.Utah 1984); *Selby v. Shulsen,* 600 F.Supp. 432, 433–34 (D.Utah 1984). And a "double-counting" argument was recently rejected in *Lowenfield v. Phelps,* —— U.S. ——, ——, 108 S.Ct. 546, 553–54, 98 L.Ed.2d 561 (1988).

ing was held and the following facts were developed.

Prior to defendant's confession, police officers were told that Graeme Cunningham had been planning to go with his friend, J.H., and J.H.'s father, Roger Downs, on a vacation to California two days after Graeme's disappearance. The officers also learned that Downs had contacted Graeme by telephone just before Graeme disappeared.

Further investigation revealed that Downs had lived at several addresses in the Salt Lake City area, that he had offered to take a nude photograph of a young boy, that he had spent a lot of money on young boys, and that he told dirty jokes to young boys. The officers also learned that Downs was not J.H.'s father and that he might have been using other names—Lynn Jones and Arthur Bishop.

Thereafter, the officers discovered that Lynn Jones was wanted for forgery or theft and that Arthur Bishop was wanted for violating the terms of his probation. Subsequently, a wire was sent to western United States law enforcement agencies requesting that defendant be located and detained. The officers also searched defendant's house and located four or five marijuana plants.

In the afternoon of July 24, 1983, Officer Smith was notified that Downs and J.H. were at the Cunningham residence. When Smith arrived at the Cunninghams', he was greeted by Officers Lenford and White. After introductions and about five minutes of questioning defendant and J.H. about Graeme's whereabouts, Lenford suggested that because of the noise and commotion at the Cunningham residence, the officers, J.H., and defendant proceed to the Metropolitan Hall of Justice. Defendant was allowed to drive alone in his own car to the police station, while Smith drove J.H.

The group arrived at the police station at about 1:50 p.m. Defendant and Smith went into White's office, and J.H. went with Lenford to his office. The group waited for another officer who had been working on the case, Detective Bell, to arrive. During this period, defendant

spoke of his relationship with Graeme and several unrelated subjects.

Bell arrived about forty-five minutes later and then conducted an hour-long interview with J.H. concerning his relationship with defendant and Graeme. Bell learned that J.H. slept with defendant, that defendant had asked J.H. to pose for nude photographs, that defendant kept photographs of young nude boys, and that defendant might be involved in the disappearance of Kim Peterson.

Thereafter, Bell asked defendant and Smith to accompany him to a different floor of the station for the purpose of formally interviewing defendant. The two officers began a taped interview at about 3:56 p.m. to determine whether defendant knew anything about Graeme's disappearance. Bell testified that defendant was not then read his *Miranda* rights because he was not a suspect in the Cunningham case, but was only a person police were interviewing during the investigation. Bell considered the discussion to be a routine interview.

Approximately fifty minutes into the interview, after he mentioned he was confessing to something, defendant was read his *Miranda* rights:

Q ... Did you or did you not take them [the pictures], do you still have them? [J.H.] says you still have them, that you keep them in a little locked box. You know are they momentos [sic] or what the hell are they?

A Why did....

Q You know [if] I come up with a little dead boy you know, your [sic] going to be looking real good.

Q Why did you quite [sic] taking them?

A I felt too guilty.

Q Information we have, is that ... [J.H.] wouldn't let you take them any more, is that right?

A He didn't like me to, no.

Q [J.H.] told you not to take them....

A I'm just confessing to everything that we just ..... will kill me later.

Q Okay, what your [sic] confessing to....

A Anything that I said here is going to be used against me and whether or not you've got other evidence this will be the most damning of all, so why do you want me to sit and talk to you?

Q Evidences to what?

Q Evidence to what? I'm not in ... there's nothing evidence here.

A Okay, you mentioned pictures, I say ... okay, well what if I did take them or I admit that I did ... guess.... what theyr'e [sic] going to play in court....

Q Court for what?

A You know I can only get.....

Q Court for what?

A You can take me to court on this.

Q No I can't.

A Nothing else ...

Q You want me to read you your Miranda Rights, right now? I can't use anything that you say against me unless I read you your Miranda Warning. Okay? Have I read you your Miranda Warning yet?

A No, you haven't.

Q Would you like me to read it to you?

A ...

Q Huh? We'll do that okay? Then you'll feel even better and then I'll feel even better, okay? Because right now we've got to the point to where I think maybe there's something going on here that doesn't quite meet the eye. So you sit and you listen Roger, okay? [*Miranda* rights given and waived.]

Bell testified that he believed defendant was going to make statements concerning "what he was wanted for." Shortly thereafter, at about 4:56 p.m., defendant turned off the tape recorder, made reference to the *Miranda* warning and his right to have an attorney present, and indicated that he did not wish to talk anymore.

Bell admitted that during the interview he inferred that defendant was going to prison on the felony warrants and that he told defendant that the inmates at the prison would not react well when they found out that defendant "liked to hang out with little boys" and "sleep with little boys." He also acknowledged that while in the presence of defendant, he made the statement to Smith, "Go ahead, I'm going to punch his lights out."

After defendant had turned off the tape recorder, Smith presented defendant with one of the warrants for his arrest. During the ten-minute period that followed, defendant stated to the officer in effect that he wished he were dead and that Graeme was his friend. After using the restroom and again saying something about wanting to be dead, defendant asked, "[W]hat do we do now?" When told that he was going to jail, defendant expressed fears about being raped in jail and stated that he did not want to go there. Defendant was told that he would not be raped, and when the officers proceeded to take defendant down to the jail, he stated that he wanted to talk to them. Bell told defendant several times that the officers could not talk to him because he had required them to stop.

Defendant responded, "[Y]ou are going to find out everything anyway," again stated in effect that he should be dead, and said he wanted to tell the officers about "something big." Defendant then asked, "[H]ow long would it take the state to kill me if I had committed the ultimate?" After a detailed conversation "concerning the judicial system and lawyers in general," Bell asked defendant if he knew where Graeme was; the time was 5:25 p.m.[66] Defendant responded, "You can't help him anyway." Shortly thereafter, defendant suggested that the officers accompany him to his house to find some items of interest. After defendant was allowed to telephone J.H.'s mother and sign a consent form for

**66.** The State's brief notes that although Bell did not question defendant from the time the tape recorder was turned off until this point concerning Graeme's whereabouts, Smith did ask "a couple" of such questions. Although some of Smith's testimony could be so read, subsequent examination indicates that Smith's questions about Graeme's whereabouts occurred after defendant's statement about "the ultimate."

entry into his house, the officers hand-cuffed defendant and drove him to his house. There, defendant turned over a revolver and numerous photographs of nude young boys.

At approximately 6:23 p.m., the officers and defendant arrived back at the police station. Officers White, Smith, and Bell conducted a second taped interview with defendant. The officers asked, "What happened to Graeme?" to which defendant responded, "Graeme is dead," and then said that he had killed him. Shortly thereafter, Bell discovered that the tape machine was not operating, switched it on, prefaced the tape with the time and date, and again reminded defendant of his rights. Defendant then confessed to the killing of five boys. He gave further incriminating statements about the crimes as he guided officers to the areas where he had disposed of the bodies. During this time, officers made no threats, inducements, or promises to defendant.

At the conclusion of the hearing, the trial court denied defendant's motion to suppress the confession. At trial, defendant renewed his objection to admission of the confession. Defendant argues on appeal that his confession should have been suppressed because it was involuntary and because he did not adequately waive his right to have counsel present during questioning. Specifically, defendant claims that impermissibly coercive methods were utilized by police to extract his confession, thereby making it involuntary.[67] Defendant also contends that his rights under *Miranda v. Arizona*[68] were violated in two ways: first, because of the delay by police in advising him of his *Miranda* rights; and second, because police officers, in violation of *Edwards v. Arizona*,[69] continued to question him after he had invoked his right to counsel.

### B

When the State seeks to use an allegedly involuntary confession against a criminal defendant at his or her trial, he or she is "entitled to a reliable and clear-cut determination that the confession was voluntarily rendered."[70] In this regard, the State bears the burden of proving by at least a preponderance of the evidence that the confession was voluntary.[71]

During the last forty-plus years, the United States Supreme Court has used several phrases to define the concept of "voluntariness" within the meaning of the due process clause of the fourteenth amendment.[72] Review of those phrases "yield[s] no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen."[73] Instead, determining the voluntariness of a confession requires the court to "consider the 'totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'"[74] Many important factors to con-

67. "[T]he issues of voluntariness and compliance with *Miranda* are separate constitutional defenses." *United States v. Curtis,* 568 F.2d 643, 647 (9th Cir.1978).

68. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

69. 451 U.S. 477, 107 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

70. *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 627, 30 L.Ed.2d 618 (1972).

71. *Id.* at 489, 92 S.Ct. at 627. To the extent that *State v. Hinton,* 680 P.2d 749 (Utah 1984) (per curiam) is inconsistent with this rule, it is overruled.

72. *See United States v. Gordon,* 638 F.Supp. 1120, 1144–45 (W.D.La.1986) and cases cited therein, *aff'd,* 812 F.2d 965, 968, 971 (5th Cir. 1987), *cert. denied,* — U.S. ——, 107 S.Ct. 2488, 96 L.Ed.2d 380 (1987); *see also Procunier v. Atchley,* 400 U.S. 446, 453, 91 S.Ct. 485, 489, 27 L.Ed.2d 524 (1971); *Brooks v. Florida,* 389 U.S. 413, 415, 88 S.Ct. 541, 542, 19 L.Ed.2d 643 (1967); *Haynes v. Washington,* 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963). Most recently, the Supreme Court has noted that "*coercive* police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986) (emphasis added).

73. *Schneckloth v. Bustamonte,* 412 U.S. 218, 224, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973).

74. *Gordon,* 638 F.Supp. at 1145 (citing *Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047); *see also*

sider in making this determination have been enumerated.[75]

Defendant alleges several circumstances which he claims combined to render his confession involuntary: he had just returned from a long trip; he was questioned by three officers as opposed to one detective; the interrogation took place over a six-hour period of time; he was asked about his homosexuality, his feelings about women, and his interest in young boys; and he was threatened with physical violence and poor treatment at the Utah State Prison.

We have made our own examination of the record,[76] examined the totality of the circumstances in light of the applicable factors, and determined that defendant's statements were voluntarily made.

Although some of Bell's remarks during the initial interview may be characterized as "threatening" in nature, when viewed in the totality of surrounding circumstances, the police interrogation does not reveal utilization of those impermissible methods proscribed by the fourteenth amendment. Defendant was a mature person who was not unfamiliar with the criminal law system. Further, he stated in his confession that he had graduated from high school, and while he was waiting for Bell to arrive, he stated that he was a business school graduate. Defendant manifested no signs of mental illness. In fact, it appears from the record that his motive for confessing was to expiate his guilty conscience.

Moreover, Bell testified that his prison comments were not intended to instill fear in defendant and further stated that defendant appeared unaffected by his comments. Although improper, Bell's statement to Smith that he was going to "punch defendant's lights out" was made in response to defendant's having called him a "smart ass" and was not intended to scare or intimidate defendant. Bell testified that defendant did not appear afraid because of the comment and that Bell immediately walked out of the room after making it.

The record discloses that defendant was not unlawfully detained by police and that the officers made no threats, promises, or inducements to obtain the confession. And although the officers' statements were direct and contained profanity, when viewed in light of defendant's age, education, and background, we are not in the least satisfied that the trial court abused its discretion.

Defendant's other "circumstances" do not alter our view of the record. He was not subjected to unduly long periods of questioning. Furthermore, although the number of police officers who conduct such questioning is surely a factor to consider, we do not view the presence of more than one officer during the questioning in this case at all sufficient to cause defendant's confession to be involuntary. Finally, defendant's suggestion that he was particularly susceptible to the officers' questions because he had just driven back from California with little rest is not supported by

---

*State v. Hegelman,* 717 P.2d 1348, 1350 (Utah 1986).

**75.** For an excellent compilation of many of the factors the Supreme Court has considered important in making the "voluntariness" determination, see *Gordon,* 638 F.Supp. at 1145 and cases cited therein; *see also Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047; *Hegelman,* 717 P.2d at 1350 ("[P]hysical or psychological force or manipulation that is designed to induce the accused to talk when he otherwise would not have done so" is evidence of an involuntary confession.); *Moore,* 697 P.2d at 236 ("A confession cannot 'be extracted by threats or violence or obtained by improper influences or promises' and still be deemed to be voluntary.") (citing *State v. Watts,* 639 P.2d 158, 160 (Utah 1981)); *State v. Ashdown,* 5 Utah 2d 59, 296 P.2d 726

(1956), *cert. granted,* 353 U.S. 981, 77 S.Ct. 1286, 1 L.Ed.2d 1141 (1957), *aff'd,* 357 U.S. 426, 78 S.Ct. 1354, 2 L.Ed.2d 1443 (1958); *State v. Crank,* 105 Utah 332, 142 P.2d 178 (1943).

**76.** "[I]t is the duty of an appellate court ... 'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.'" *Beckwith v. United States,* 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976) (citation omitted); *see also United States v. Hawkins,* 823 F.2d 1020, 1022–23 (7th Cir. 1987); *United States v. Wolf,* 813 F.2d 970, 974 (9th Cir.1987); *cf. United States v. McConney,* 728 F.2d 1195 (9th Cir.1984) (en banc) (generally mixed questions of law and fact should be treated as questions of law and fact and reviewed de novo by the appellate court), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

the record. Indeed, Bell's uncontradicted testimony was that defendant did not appear ill or tired.

## C

 Defendant argues that his confession should have been suppressed because he was not apprised of his *Miranda* rights at the outset of police questioning despite the fact that he was the focus of a police investigation. We are unpersuaded.

Defendant's analysis emphasizes the factual circumstances, described above, surrounding the initial questioning of defendant in light of those factors we have declared most important in determining whether an accused who has not been formally arrested is nevertheless in "custody." [77] Defendant concludes therefrom that he was in "custody."

Police officers investigating serious crime cannot realistically be expected to make error-free determinations of when "custody" begins.[78] When they do err, unwarned statements made by a defendant while being subjected to custodial interrogation are presumptively the product of impermissible compulsion,[79] and thus such statements must generally be excluded from evidence under *Miranda*.[80] It is at this point that defendant's argument falters.

Defendant was in custody prior to the reading of his rights. However, he has not identified any incriminating statements made by him before he was given his *Miranda* rights or how the introduction of any such statements prejudiced him at tri-

al. Where a subsequent confession is constitutionally obtained, "the admission of prior inadmissible confessions may constitute harmless error." [81] And the United States Supreme Court has stated:

> If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.[82]

The United States Supreme Court applied this latter principle in *Oregon v. Elstad,*[83] holding that a suspect who has once responded to unwarned yet uncoercive questioning which resulted in an inculpatory admission is not thereby disabled from waiving his rights and making a confession after being given the requisite *Miranda* warnings.[84] The Court therein stated that in such a case the relevant inquiry is whether, in fact, the confession subsequent to the reading of *Miranda* was voluntarily

---

**77.** Those factors are (1) the site of the interrogation; (2) whether the investigation focused on the accused; (3) whether objective indicia of arrest were present; and (4) the length and form of the interrogation. *State v. Kelly,* 718 P.2d 385, 391 (Utah 1986); *Salt Lake City v. Carner,* 664 P.2d 1168, 1171 (Utah 1983).

**78.** *See Michigan v. Tucker,* 417 U.S. 433, 446, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974).

**79.** *Miranda,* 384 U.S. at 467, 86 S.Ct. at 1624.

**80.** *Id.* at 479, 86 S.Ct. at 1630.

**81.** *United States v. Johnson,* 816 F.2d 918, 923 (3d Cir.1987) (citing *Bryant v. Vose,* 785 F.2d

364, 367 (1st Cir.), *cert. denied,* 477 U.S. 907, 106 S.Ct. 3281, 91 L.Ed.2d 570 (1986); *United States v. Packer,* 730 F.2d 1151, 1157 (8th Cir. 1984)); *see also Christopher v. Florida,* 824 F.2d 836, 846 n. 23 (11th Cir.) ("Although the admission of a coerced confession is never harmless error, an otherwise unlawful but voluntary confession can be harmless error.") (citations omitted), *petition for cert. filed,* 56 U.S.L.W. 3356 (U.S. Oct. 29, 1987) (No. 87–718).

**82.** *Oregon v. Elstad,* 470 U.S. 298, 309, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222 (1985); *see also id.* at 314, 105 S.Ct. at 1296.

**83.** 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222.

**84.** *Id.* at 309–12, 105 S.Ct. at 1293–95.

made by the defendant after he waived those rights.[85]

Application of *Elstad* to this case prompts the conclusion that even though defendant was in custody during initial police questioning prior to the reading of his *Miranda* rights, and even if he made some inculpatory admissions during this period concerning his subsequent confession, his contention is without merit. As analyzed above, defendant's statements to the police were not the product of coercion or duress, but were voluntarily made.[86] After the initial police interview began, defendant voluntarily answered police questions. He was read his *Miranda* rights, voluntarily and knowingly waived those rights, and continued to voluntarily answer police questions. Defendant then invoked his rights, but subsequently waived them a second time. As will be explained below, we have concluded the second waiver was valid. Defendant then confessed to the killings. Since both the unwarned statements and warned statements were voluntary, and since defendant waived his rights, his claim that the delay in reading him his *Miranda* warning affected the admissibility of his confession to the killings is unpersuasive. We note that the trial court should have excluded the unwarned statements; however, the error was harmless.

### D

 Defendant next contends that the officers unlawfully continued to question him after he invoked his right to counsel. In *Edwards v. Arizona*,[87] the United States Supreme Court held that an accused in custody, once having expressed his desire to deal with police only through counsel, is not subject to further interrogation unless counsel has been made available to him, unless he validly waives his earlier request.[88] *Edwards* established a new bright-line test for determining when such a waiver would be acceptable.[89] Application of the *Edwards* test requires the trial court to initially determine whether the accused invoked his right to counsel.[90] If the court makes an affirmative finding with respect to this inquiry, it may admit responses to post-invocation questioning only after affirmatively finding that the following test has been satisfied:

First, it must be the accused, not law enforcement officers, who initiated the conversations in which the incriminating statements [were] made. Second, the prosecution must show, on the motion to suppress, a knowing and intelligent waiver of the right to counsel. Third, the accused's statements must be shown by a preponderance of the evidence to have been voluntarily made.[91]

The record supports defendant's contention that he invoked his right to counsel, as opposed to merely invoking his right to silence. Moreover, defendant concedes that he initiated the conversation with police concerning the killings, and this fact is amply supported by the record.[92] And because we have already determined that defendant's statements were voluntary, we need only resolve whether the trial court erred in determining that defendant know-

---

85. *See id.* at 319; *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986) (discussing effective waiver of *Miranda* rights).

86. *See supra* pp. 463–465.

87. 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

88. *Id.* at 484–86, 101 S.Ct. at 1884–85; *see also Smith v. Illinois,* 469 U.S. 91, 94–95, 105 S.Ct. 490, 492–93, 83 L.Ed.2d 488 (1984).

89. *Solem v. Stumes,* 465 U.S. 638, 646, 104 S.Ct. 1338, 1343, 79 L.Ed.2d 579 (1984); *see also Fare v. Michael C.,* 442 U.S. 707, 719, 99 S.Ct. 2560, 2569, 61 L.Ed.2d 197 (1979).

90. *Smith,* 469 U.S. at 95, 105 S.Ct. at 493.

91. *Moore,* 697 P.2d at 236; *see also Smith,* 469 U.S. at 95, 105 S.Ct. at 493; *Oregon v. Bradshaw,* 462 U.S. 1039, 1044–56, 103 S.Ct. 2830, 2834–40, 77 L.Ed.2d 405 (1983); *Edwards,* 451 U.S. at 484–85, 486 n. 9, 101 S.Ct. at 1884–85, 1885 n. 9; *Lego,* 404 U.S. at 489, 92 S.Ct. at 627.

92. *Accord Bradshaw,* 462 U.S. at 1045, 103 S.Ct. at 2834. We emphasize that the police officers did not continue to question defendant about Graeme subsequent to his request for an attorney until he initiated the conversation. *See supra* note 66.

ingly, intelligently, and voluntarily waived his right to counsel.

It is not required that such a waiver be express; it may be inferred from a defendant's acknowledgement of his rights and his subsequent course of conduct.[93] The determination turns upon " 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' "[94]

We conclude that the record supports the trial court's determination on the waiver issue. Defendant was advised of his rights prior to confessing to the killings. Moreover, officers repeatedly told defendant they could not talk to him because he had invoked his rights. And defendant's damning statements were not made until after a further discussion with the police concerning the judicial system and lawyers in general. Defendant was not unlawfully detained by police, and the detectives made no threats, promises, or inducements to obtain defendant's statements. Defendant had a formal education and was familiar with the criminal law system. Nor did he manifest signs of fatigue or illness. In short, the record shows that despite knowing of his right to have counsel present, the seriousness of his crimes, and the potential penalties he faced, defendant decided to make a confession. We therefore find defendant's point to be without merit.

### IX

Three of defendant's points, nine, ten, and eighteen, relate to Utah's manslaughter statute.

### A. MANSLAUGHTER INSTRUCTIONS

Defendant claims that since the trial court misinstructed the jury on the crime of manslaughter, it should have granted his motion for new trial. The relevant manslaughter statute provided: "Criminal homicide constitutes manslaughter if the actor ... [c]auses the death of another under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation or excuse."[95]

Defendant's theory of the case was that his "homosexual pedophilia with narcissistic overtones" constituted an extreme mental or emotional disturbance for which there was a reasonable explanation or excuse. His proffered instructions explained that a "disturbance" within the meaning of the manslaughter statute could arise from an internal stimulus as well as from an external event, that there had to be a reasonable explanation for the disturbance, and that the disturbance must have influenced his conduct. The proposed instructions additionally provided:

> In order to determine whether or not there was a reasonable explanation you must consider the facts and evidence from the viewpoint of the defendant, under the circumstances as he believed them to be. You should not be concerned with how most people would act under the circumstances of this case, nor should you be concerned with what could have been the legal or logical thing for the defendant to have done. You must not compare what the defendant did with the morally ideal response under the same circumstances, but you must place yourselves in the actual situation and circumstance in which the defendant was placed.

The jury was instructed as follows:

#### [Instruction 28]

> For Manslaughter to apply, the "extreme mental or emotional disturbance" must be triggered by something external from the accused, and his reaction to such external stimulus must be reasonable, and the terms must be given the meaning you would give them in common everyday use. Such disturbance there-

---

**93.** *See North Carolina v. Butler,* 441 U.S. 369, 372–76, 99 S.Ct. 1755, 1757–58, 60 L.Ed.2d 286 (1979).

**94.** *Id.* at 374–75, 99 S.Ct. at 1758 (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)).

**95.** Utah Code Ann. § 76–5–205(1)(b) (1978) (amended 1985).

fore cannot have been brought about by his own peculiar mental processes or by his own knowing or intentional involvement in another crime.

"Extreme" means excessive, or far advanced, or grievous.

"Mental" means relating to or existing in the mind.

"Disturbance" refers to a state of being disturbed, agitated, disordered, or distressed.

"Emotional" pertains to emotions and has to do with feelings or passions.

In determining whether or not the defendant acted under the influence of extreme mental or emotional disturbance, you should consider all of the circumstances surrounding the death of each individual child. If you find that the defendant, Arthur Gary Bishop, caused the death of each individual child while under the influence of extreme mental or emtoional [sic] disturbance, you must next determine whether or not there was a reasonable explanation or excuse for such disturbance. The reasonableness of the explanation or excuse for the extreme mental or emotional disturbance is to be determined from the viewpoint of a reasonable person under the then existing circumstances.

[Instruction 28A]

If you find from the evidence that any killing of each individual child was knowingly or intentionally done you may still find the defendant only to be guilty of Manslaughter if you are satisfied from the evidence that the prosecution has failed to prove beyond a reasonable doubt that at the time of any killing the defendant was not acting from an extreme mental or emotional disturbance that was reasonably caused.

In determining whether the actions of the defendant may have been attributable to an extreme mental or emotional disturbance that was reasonably caused you must next determine whether a reasonable person would have suffered an extreme mental or emotional disturbance from the same or similar circumstances. If a reasonable person in your judgment would have sustained an extreme mental or emotional disturbance from the circumstances involved that may have caused any death in this case then you should return a verdict of guilty of Manslaughter. If, however, a reasonable person would not have sustained such condition or reaction, Manslaughter would not be a proper verdict.

■ Defendant claims that the instructions erroneously limited "extreme mental or emotional disturbance[s]" to those triggered by something external to defendant to which his reaction had to be reasonable. Resolution of this issue turns upon the proper interpretation of section 75-5-205(1)(b).

Presumably, the legislature carefully selected the terms of the statute in question.[96] However, it is our primary responsibility to give effect to the legislature's intent, even if our interpretation appears at odds with conventional usage or literal construction of the statutory language.[97] Words must be construed in light of the total context of the legislation,[98] and when possible, statutes must be interpreted harmoniously with other statutes relevant to the subject matter.[99] Moreover, the historical development of a statute may be pertinent to its meaning. With these principles in mind, we turn to the historical development of section 76-5-205 and other related statutes in the Utah Code.

Prior to 1973, "voluntary manslaughter" was, in relevant part, the unlawful killing of another, committed upon sudden quarrel

---

**96.** *See State v. Franklin,* 735 P.2d 34, 37 (Utah 1987).

**97.** *Pollack v. Department of Motor Vehicles,* 38 Cal.3d 367, 372, 696 P.2d 141, 143, 211 Cal.Rptr. 748, 751 (1985) (en banc); *American Coal Co. v. Sandstrom,* 689 P.2d 1, 3 (Utah 1984).

**98.** *Cannon v. McDonald,* 615 P.2d 1268, 1270 (Utah 1980).

**99.** *Stahl v. Utah Transit Autho.,* 618 P.2d 480, 481 (Utah 1980).

or in the heat of passion.[100] The Court held that "heat of passion" required adequate provocation such that the accused's reason and control were temporarily disturbed or obscured.[101] The question of whether adequate provocation existed and the question of whether a defendant should have "cooled off" before the killing took place were answered by application of an objective standard.[102]

During this period, an accused could plead not guilty due to insanity, which was defined by the *M'Naughten* test coupled with the irresistible impulse doctrine.[103] Also during this period, the affirmative defense of diminished capacity was introduced by this Court's cases and could reduce murder to manslaughter.[104] "Diminished capacity" is a mental disease or defect not amounting to insanity that impairs a defendant's ability to form the specific intent necessary to prove certain crimes.[105]

In short, prior to 1973, application of either the manslaughter statute or the diminished capacity defense reduced murder to manslaughter. Diminished capacity was the subjective approach, which required the fact finder to focus on the defendant's ability to form the required intent, while manslaughter required application of an objective standard and was grounded on principles of mitigation.

Section 76–5–205 was enacted in the 1973 criminal code revision and had its genesis in Model Penal Code section 210.3.[106] In addition to that portion of section 76–5–205(1)(b) quoted above,[107] subsection (2) provided: "The reasonableness of an explanation or excuse ... shall be determined from the viewpoint of a person in the actor's situation under the circumstances as he believes them to be." [108] Since section 76–5–205 was modeled after section 210.3 of the Model Penal Code, the American Law Institute's Commentaries and cases from other jurisdictions explaining and construing similar provisions provide insight into the meaning of section 76–5–205 in 1973.

The commentary to section 210.3 explains that subsection (1)(b) of the Model Code substantially enlarges the class of cases that might be reduced to manslaughter.

> This formulation treats on a parity with classic provocation cases situations where the provocative circumstance is something other than an injury inflicted by the deceased on the actor, but nonetheless is an event that arouses extreme mental or emotional disturbance. [And t]here is a larger element of subjectivity in the standard than there was under prevailing law....[109]

The Model Code was drafted, among other things, to do away with categories of ade-

---

**100.** Utah Code Ann. § 76–30–5 (1953) (repealed 1973).

**101.** *See State v. Ross,* 28 Utah 2d 279, 282, 501 P.2d 632, 634–35 (1972); *see generally* Model Penal Code § 210.3, comments 1–2, at 44–48; *id.* comment 5, at 54–60 (1980).

**102.** *See Ross,* 28 Utah 2d at 282–83, 501 P.2d at 635.

**103.** *State v. Sessions,* 645 P.2d 643, 645 (Utah 1982); Utah Code Ann. §§ 77–24–1(2) (1953) (repealed 1980), 76–1–21, –41 (1953) (repealed 1973).

**104.** *See State v. Green,* 78 Utah 580, 602, 6 P.2d 177, 186 (1931).

**105.** *Sessions,* 645 P.2d at 644; *see also State v. DePlonty,* 749 P.2d 621, 625–26 n. 3 (1987).

**106.** Section 210.3 provides:

> (1) Criminal homicide constitutes manslaughter when:
> (a) it is committed recklessly; or
> (b) a homicide which would otherwise be murder is committed under the influence of extreme mental or emotional disturbance for which there is reasonable explanation or excuse. The reasonableness of such explanation or excuse shal [sic] be determined from the viewpoint of a person in the actor's situation under the circumstances as he believes them to be.
> (2) Manslaughter is a felony of the second degree.

**107.** *Supra* p. 467.

**108.** Utah Code Ann. § 76–5–205(2) (Supp.1973) (amended 1975 & 1985).

**109.** Model Penal Code § 210.3, comment 3, at 49 (1980); *see also* Model Penal Code § 210.3, comment 5, at 61–62 (1980).

quate provocation which had developed in the cases.[110]

Importantly, the Model Code does not recognize the diminished capacity defense.[111] However, section 210.3's emphasis on the actor's subjective mental state allows inquiry into areas traditionally treated under the law of diminished capacity.[112] Indeed, it has been said that the Model Code in fact adopted an expanded concept of diminished capacity to diminish murder to manslaughter.[113]

In addition to Utah, several states have apparently adopted some or all of the substance of Model Code section 210.3(1)(b).[114] Of those states, only Hawaii, Montana, and New Hampshire apparently permit mitigation in cases involving an extreme *mental or* emotional disturbance, the other states opting to omit the word "mental."[115] Furthermore, all these states except New Hampshire still explicitly contain the Model Code's subjective standard.

In 1973, Utah's insanity defense was conformed to the Model Code's definition.[116] However, in *State v. Sessions,*[117] the Court held that despite this change, diminished capacity continued to be an affirmative defense to crimes requiring knowledge or a particular intent.[118]

In summary, by mid–1973, the legislature had enacted the manslaughter and insanity provisions of the Model Code, a code which did not recognize the affirmative diminished capacity defense but nonetheless allowed much of the substance of that de-fense to be considered in homicide cases by means of the new subjective/objective manslaughter statute. *Sessions* continued the diminished capacity defense in Utah despite this fact.

In mid–1975, the legislature deleted subsection 76–5–205(2). The 1975 version of the statute, quoted above in relevant part,[119] controls this case.

In 1983, the insanity statute was repealed and reenacted to provide in part: "It is a defense ... that the defendant, as a result of mental illness, lacked the mental state required as an element of the offense charged."[120] The amending act altered other sections of the Code, including Utah Code Ann. § 77–14–3 (Supp.1983) (amended 1986), which provided in part:

(1) When a defendant proposes to offer evidence that he is not guilty as a result of insanity or that he had diminished mental capacity, he shall, at the time of arraignment or as soon thereafter as practicable, but not less than 30 days before the trial, file and serve the prosecuting attorney with written notice of his intention to claim such defense.

(2) If the defendant fails to meet the requirements of subsection (1), he may not introduce evidence tending to establish the defense unless the court for good cause shown shall otherwise order.

The obvious import of the above history is that the legislature intended in 1975 to do away with the subjective aspect of the manslaughter statute. There is no other

---

110. Model Penal Code § 210.3, comment 5, at 57, 61 (1980).

111. *Id.* at 72.

112. *Id.* at 54; *see generally id.* at 60–73; *see also State v. Dumlao,* 715 P.2d 822, 829 (Haw.Ct.App. 1986).

113. *Dumlao,* 715 P.2d at 829.

114. Ark.Stat.Ann. § 5–10–104 (1987); Conn.Gen. Stat. §§ 53a–54a, –55, –56 (1987); Del.Code Ann. tit. 11, §§ 632, 641 (1979); Haw.Rev.Stat. § 707–702 (1985); Ky.Rev.Stat.Ann. § 507.050 (1985); Mont.Code Ann. § 45–5–103 (1987); N.H.Rev.Stat.Ann. § 630:2 (1986); N.Y. Penal Law §§ 125.20(2), .25(1)(a), .27(2)(a) (McKinney 1987); N.D.Cent.Code § 12.1–16–01 (1985); Or.Rev.Stat. §§ 163.115, .118, .135 (1985).

115. A review of these states' annotations suggests that their courts have paid little, if any, attention to the omission of the word "mental" when construing their manslaughter statutes.

116. *DePlonty,* 749 P.2d at 625; Utah Code Ann. § 76–2–305 (1978) (amended 1983 & 1986); *see also* Model Penal Code § 4.01, at 163 (1987).

117. 645 P.2d 643.

118. *See id.* at 645; *see also DePlonty,* 749 P.2d at 625–26 n. 3.

119. *Supra* p. 467.

120. Utah Code Ann. § 76–2–305 (Supp.1983) (amended 1986).

reasonable explanation as to why that body carefully excised subsection 76–5–205(2). And we are unpersuaded that the 1986 amendment to the manslaughter statute implicitly recognized that the statute still contained a subjective component. In light of the prevailing method in the legal community of relying upon the Model Code's commentaries when interpreting statutes patterned after the Model Code, it is not surprising that the legislature found it necessary to clarify the 1975 amendments. Therefore, while the Model Code's commentaries may be helpful in some respects when interpreting section 76–5–205, they must be relied upon with caution since the legislature has drastically modified the Model Code's manslaughter statute. For this reason, reliance upon cases decided in jurisdictions following the subjective approach must also be viewed with caution; only New Hampshire has modified its statute in ways somewhat similar to the statute at issue.[121]

Approaching the manslaughter statute at issue from a purely objective standpoint is consistent with the amended insanity statute, the notice statute,[122] and this Court's case law concerning diminished capacity.[123] Section 77–14–3 (Supp.1983) (amended 1986), which made clear that the "mental illness" in section 76–2–305 (Supp.1983) (amended 1986) referred to insanity or diminished capacity, would make little sense if by its terms a defendant was required to give notice of a diminished capacity defense while at the same time, the Code allowed him to escape this requirement and other relevant provisions of title 77 chapter 14 in homicide cases by using the manslaughter statute interpreted according to the Model Code's formulation.

Therefore, defendant's subjective mental state should be irrelevant in determining whether the explanation or excuse for the disturbance is reasonable. Of course, the jury would still decide whether a defendant was under the influence of the disturbance when he committed the homicide. But the reasonableness of the explanation or excuse should be determined from the viewpoint of the average, reasonable person under then-existing circumstances. Under this construction, it follows that the emotional disturbance must be externally caused.[124]

Defendant, however, complains that the instructions were erroneous because they required the disturbance to be "triggered." Utah's statute, as construed above, has two principal elements: (1) the killing must be committed while under the influence of an extreme mental or emotional disturbance, and (2) there must be a reasonable explanation or excuse for the disturbance. In *People v. Shelton*,[125] the court, in a well-reasoned case, defined "extreme emotional disturbance." [126] Adapting that standard to conform with the above discussion, a person suffers from an extreme mental or emotional disturbance:

(1) when he has no mental illness as defined in section 76–2–305 (insanity or diminished capacity); and

(2) when he is *exposed* to extremely unusual and overwhelming stress; and

(3) when the average reasonable person under that stress would have an extreme emotional reaction to it, as a result of which he would experience a loss of self-control and that person's reason would be overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation, or other similar emotions.

---

**121.** N.H.Rev.Stat.Ann. § 630:2 (1986) provides in part:
 I. A person is guilty of manslaughter when he causes the death of another:
 (a) Under the influence of extreme mental or emotional disturbance caused by extreme provocation but which would otherwise constitute murder; or
 (b) Recklessly.

**122.** Utah Code Ann. § 77–14–3 (Supp.1983) (amended 1986).

**123.** *E.g., Sessions,* 645 P.2d 643.

**124.** *Accord State v. Norman,* 580 P.2d 237, 240 (Utah 1978).

**125.** 88 Misc.2d 136, 385 N.Y.S.2d 708 (N.Y.Sup. Ct.1976), *aff'd,* 78 A.D.2d 821, 434 N.Y.S.2d 649 (N.Y.App.Div.1980).

**126.** 385 N.Y.S.2d at 717–18.

It seems clear that some external initiating circumstance must bring about the disturbance, and we perceive no error on the part of the trial court by merely incorporating this proposition into the phrase "triggered by an external event."[127]

■ Defendant claims that the instructions impermissibly limited "the possible domain of disturbances to those which may have arisen from sources external to the accused *at the time of each killing.*" (Emphasis in original.) Given the fact that this case involved five separate murders, the court's instruction to view the circumstances surrounding each individual killing did not impermissibly limit the factors the jury could consider; the court did not abuse its discretion since the jury had to consider each case individually. Moreover, the court correctly instructed the jury that the disturbance could not be brought about by defendant's criminal conduct, a concept that is implicit in the statute.[128]

Finally, the instructions should not be read as requiring the jury to find that defendant's acts of killing were reasonable. The instructions merely explained that the disturbance must have had a reasonable explanation or excuse. We should therefore conclude that the trial court properly instructed the jury on the crime of manslaughter.

## B. PSYCHOLOGICAL EXAMINATION

■ Defendant next argues that the court erred by ordering two appointed psychiatrists to evaluate him. He argues that the court erroneously refused to accept his contention that he was not claiming diminished capacity or insanity as a defense, despite repeated reassurances that his psychiatric testimony would only be introduced to assist the jury in determining whether he suffered from a mental or emotional disturbance for which there was a reason-able explanation or excuse. He claims that he suffered prejudice because of the court-ordered examination and condemns the court for defining his defense.

The relevant facts follow. On February 28, 1984, defense counsel verbally notified the prosecution of defendant's intent to call witnesses concerning "[d]efendant's mental disturbance." The following day, defendant filed a notification, under order by this Court, that two defense psychiatrists would testify to the existence at the time of the homicides of any mental disturbance in defendant "which is reasonably explained or excused." On March 5, defendant filed his own affidavit and a memorandum signed by counsel stating that he was not claiming any affirmative defenses under section 76–2–308 (1978). That same day, during his opening statement defense counsel focused the jury's attention on certain subjective aspects of defendant's mental state. The following day, the prosecution filed a motion requesting that its psychiatrists be allowed to examine defendant. At the hearing on the motion, the court waived the thirty-day notice requirement in section 77–14–3 and explained that defendant would be precluded from presenting his own psychiatric testimony if he refused to submit to the examination.[129] The court granted the motion based upon rule 16 of the Utah Rules of Criminal Procedure, Utah Code Ann. § 77–14–4 (Supp.1983) (amended 1986), and the court's inherent power to ensure fairness to all parties.

Utah Code Ann. § 77–14–3(2) (1983) (amended 1986)[130] provided that a defendant who did not file a timely notice pursuant to subsection (1) of that statute could not introduce evidence of insanity or diminished capacity *unless the court for good cause shown otherwise orders.* Utah Code Ann. § 77–14–4(1) (Supp.1983) (amended 1986) provided:

---

127. *Compare Wellman v. Commonwealth,* 694 S.W.2d 696, 697–98 (Ky.1985), *with Moore v. State,* 456 A.2d 1223, 1226 (Del.1983); *accord Dumlao,* 715 P.2d at 829, 830, 832. *But see State v. Elliott,* 177 Conn. 1, 7, 411 A.2d 3, 7 (1979).

128. Model Penal Code § 210.3, comment 5, at 64–65 (1980).

129. *See* Utah Code Ann. § 77–14–4(2) (Supp. 1983) (amended 1986).

130. *Supra* p. 470.

When the court receives notice that a defendant intends to claim that he is not guilty as the result of insanity or that he had diminished capacity, the court shall appoint two examiners qualified in forensic mental health to examine the defendant and investigate his mental condition. They shall testify at the instance of the court or either party

. . . .

Furthermore, rule 16(c) of the Utah Rules of Criminal Procedure provides: "Except as otherwise provided or as privileged, the defense shall disclose to the prosecutor ... evidence which the court determines on good cause shown should be made available to the prosecutor in order for the prosecutor to adequately prepare his case."

As the above discussion makes clear, defense counsel and the trial court disagreed on how the manslaughter statute applied. Moreover, defense counsel had prepared the defense of a complex capital case around the testimony of defendant's psychiatrists, despite the trial court's position that application of the manslaughter statute required an objective approach. The trial court was obviously concerned that if the psychiatric testimony pertained only to defendant's subjective mental condition, it would be irrelevant to defendant's manslaughter defense. It was the trial court's duty to insure that defendant and the State received a fair trial. The court fulfilled its duty by allowing defense counsel wide latitude with the defense. Indeed, on more than one occasion, the trial judge told defendant's counsel that they would get their theory of the case before the jury "one way or the other." To insure the same, the trial court, pursuant to subsection 77–14–3(2), waived the notice requirement of section 77–14–3 and ordered a psychiatric examination pursuant to section 77–14–4 and rule 16 [131] to protect the interests of the State. The court further limited the appointed psychiatric testimony to rebuttal of defendant's psychiatric testimony if defendant's case ultimately was one of diminished capacity or insanity. The court's decision was in harmony with rule 16.[132] We conclude that the trial court did not abuse its discretion. In passing, we also note that defendant has not demonstrated any significant prejudice from undergoing the examination.

Defendant also condemns the prosecution, claiming that as of February 29, the State had notice that defendant was relying on the manslaughter statute but that it delayed bringing its motion solely for the purpose of disrupting the defense. However, given the ambiguous nature of the statute, which until today has not truly been interpreted by this Court, and the complexity of this case, we perceive no improper motive and certainly no prejudice to defendant.

### C. PSYCHIATRIC TESTIMONY

■ Defendant's next point is that the trial court erred by allowing the court-appointed psychiatrist, Dr. Tomb, to testify. After defendant's psychiatrists had testified about his pedophilia, narcissisim, and antisocial personality, the trial court ruled that Dr. Tomb's testimony would be limited to commenting upon the methodology used by defense psychiatrists in their evaluation of defendant. The court explained that after hearing the defense psychiatrists' testimony, it had concluded that their testimony did not go to an affirmative defense of insanity or diminished capacity and, therefore, evidence of defendant's statements made during the court-ordered examination were inadmissible. Defendant objected to admission of any testimony by Tomb on the ground that any criticisms of the defense psychiatrists' testimony would be influenced by Tomb's interview with defendant. On appeal, defendant relies in part on *Estelle v. Smith* [133] to support his claim that his right against self-incrimination was violated. He claims that Tomb's testimony was replete with intimations that he had definite views about defendant's disorders. He claims that whether the jurors knew of

---

**131.** Utah R.Crim.P. 16(c).

**132.** *Accord* Utah R.Crim.P. 1(b).

**133.** 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

the examination is irrelevant since the doctor's testimony was affected by the examination.

In *Estelle*, the trial judge ordered a psychiatrist to determine whether the defendant was competent to stand trial. After the doctor communicated his finding of competency, the defendant was tried and convicted of murder. At the death penalty hearing, the doctor was allowed to testify over objection as to un-Mirandized statements made by the defendant during his interview and as to his conclusions based thereon. In reversing the defendant's death sentence, the Court held in part:

> A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. Because respondent did not voluntarily consent to the pretrial psychiatric examination after being informed of his right to remain silent and the possible use of his statements, the State could not rely on what he said to Dr. Grigson to establish his future dangerousness.[134]

Tomb, who has an exceptional educational background and a broad empirical foundation for his expertise, limited his testimony to criticisms of the methodologies employed by defendant's experts; because defendant did not take the stand, Tomb was not allowed to relay to the jury defendant's statements. His testimony does not at all infer that he had interviewed defendant. Nor do his answers to questions about methodology suggest that he was relying on an interview with defendant. Finally, defendant did in fact offer psychiatric testimony. In light of these facts, *Estelle* is not controlling.

Defendant's final claim, that his statements became a basis of Tomb's experience and knowledge, which was in turn used against him by means of attacking his experts' methodology, is unpersuasive. First, Tomb's extensive qualifications belie such a claim; the remote impact defendant's statements may have had on Tomb's broad knowledge and expertise is not included in the proscription against compulsory self-incrimination. Second, and more importantly, defendant has not identified any statements he made to Tomb to provide a basis for the argument. To hold that these unknown statements were used by Tomb, acting as the State's agent, against defendant would be to decide the point on the basis of conjecture and speculation. We find defendant's point to be without merit.

## X

Two of defendant's points, though framed in a different manner, involve the admissibility of various exhibits.

### A. ADMISSION OF IDENTIFICATION EVIDENCE

Defendant's eleventh point is that the trial court abused its discretion by admitting three color photographs into evidence.[135] These photos, which were admitted over objection, show the clothing and skeletal remains of Danny Davis in his grave, Graeme Cunningham's body as it was removed from a river, and Troy Ward's body in a river. In urging that the trial court abused its discretion, defendant relies in part upon *State v. Cloud*,[136] *State v. Garcia*,[137] *State v. Poe*,[138] and rule 403 of the Utah Rules of Evidence.

After reviewing the photographs, the Court is divided on the issue of whether the trial court abused its discretion by admitting the exhibits. However, as will be further explained below in the harmless-error

---

134. *Id.* at 468, 101 S.Ct. at 1876.

135. Defendant also suggests that two other photographs, one of Alonzo Daniels and one of Kim Petersen, should have been excluded. However, because these photographs were never admitted into evidence, defendant was not prejudiced by those exhibits. *See* defendant's opening brief at 135–36.

136. 722 P.2d 750 (Utah 1986).

137. 663 P.2d 60 (Utah 1983).

138. 21 Utah 2d 113, 441 P.2d 512 (1968).

analysis, the Court is unanimous in its conclusion that any error committed in this respect was harmless. This conclusion obviates the need to reach the abuse-of-discretion issue as to the photos described above.

### B. STIPULATION TO VICTIMS' IDENTITIES

■■■ The twelfth point in defendant's brief is that the trial court erred by failing to order the State to stipulate to the identities of the victims.

Before the State called its first witness, defendant made a motion to preclude the State from introducing certain identification evidence including photographs of the victims, the victims' clothing, and testimony from the victims' parents and guardians. This motion was based upon defendant's affidavit in which he admitted killing the five victims, briefly indicated the manner in which the victims were killed, and described how he disposed of the victims' bodies. Defendant's theory was that the effect of the affidavit was to render the issue of identity uncontested, thereby making the State's identification evidence irrelevant. Defense counsel told the court, "[T]his does not go to a stipulation. We are not saying that we stipulate. We are saying we admit." The trial court denied the motion. Thereafter, defense counsel objected to some of the State's physical and testimonial evidence (that defendant had sought to preclude by his motion) on the ground that he either had admitted or would stipulate to the fact sought to be proved or established. These objections were overruled.

Defendant contends that the trial court erred by admitting the State's identification evidence. He argues that the prosecution could have achieved the full probative value of the admitted testimony and exhibits without unfairly prejudicing defendant simply by stipulating to the identities of the victims.

■■■■ As a general rule, a party may not preclude his adversary's offer of proof by admission or stipulation.[139] The rationale for this rule was well stated in *United States v. Grassi:*[140]

A piece of evidence can have probative value even in the event of an offer to stipulate to the issue on which the evidence is offered. A cold stipulation can deprive a party "of the legitimate moral force of his evidence," and can never fully substitute for tangible, physical evidence or the testimony of witnesses. In most cases, a party has the right "to present to the jury a picture of the events relied upon."[141]

Notwithstanding this general rule, evidence is subject to rule 403 of the Utah Rules of Evidence. That rule provides for exclusion of relevant evidence on the ground of unfair prejudice.[142] Thus, the State is bound to stipulate to facts, to use an alternative mode of proof, or to forego introduction of the material if the evidence it offers cannot satisfy rule 403, i.e., if its probative value is substantially outweighed by the danger of unfair prejudice.[143]

■■■ In this regard, the Advisory Committee Note to rule 403 of the Federal Rules of Evidence suggests, "In reaching a decision whether to exclude on grounds of unfair prejudice ... [t]he availability of other means of proof may also be an appropriate factor." Thus, an important consideration when examining probativeness is the prosecutorial need for the proffered evidence.[144] It follows that although trial courts should seriously consider offers to stipulate in deciding whether to admit or

**139.** *See, e.g., State v. Duran,* 522 P.2d 1374, 1375 (Utah 1974); *United States v. O'Shea,* 724 F.2d 1514, 1516 (11th Cir.1984).

**140.** 602 F.2d 1192 (5th Cir.1979), *vacated on other grounds,* 448 U.S. 902, 100 S.Ct. 3041, 65 L.Ed.2d 1131 (1980).

**141.** 602 F.2d at 1197 (citations omitted).

**142.** *See, e.g., United States v. Ellison,* 793 F.2d 942, 949 (8th Cir.), *cert. denied,* — U.S. —,

107 S.Ct. 415, 93 L.Ed.2d 366 (1986); *O'Shea,* 724 F.2d at 1516.

**143.** *See Ellison,* 793 F.2d at 949 (citing *United States v. DeJohn,* 638 F.2d 1048, 1053 (7th Cir. 1981)).

**144.** *United States v. Spletzer,* 535 F.2d 950, 956 (5th Cir.1976).

exclude evidence pursuant to rule 403,[145] such an offer is only one factor that plays into the rule 403 balancing process.[146]

After carefully reviewing the record in this case, it is clear that the trial court did not abuse its discretion by not requiring the State to stipulate to defendant's admissions in his affidavit. However, we conclude that the court abused its discretion in failing to exclude three of the State's exhibits.

At trial, there was significant ambiguity concerning what defense counsel was trying to accomplish. His statement that he was making an admission as opposed to a stipulation seemed to contradict later statements that the defense was willing to stipulate to certain facts. Although such a distinction may seem at first glance to be an exercise in semantics, such is not the case; defendant was not willing to stipulate to the State's evidence at issue here. Instead, he was in effect trying to substitute his affidavit for the State's proof. Of concern is the fact that some of the disputed testimony and exhibits were relevant for purposes other than identification, and indeed the evidence in several respects went beyond what was "admitted" in defendant's affidavit or what he was willing to stipulate to. For example, testimony of the parents and guardians helped to establish the crime of aggravated kidnapping; they testified that defendant did not have permission to take the victims. Furthermore, the victims' identities were an essential element of the State's case.

Defendant relies on United States v. Spletzer[147] and United States v. Cook[148] in support of his contention. In both Spletzer and Cook, the defendants' convictions were reversed because the trial judge admitted evidence of prior convictions despite one defendant's willingness to concede and the other's ability to stipulate to the existence of the same. One important consideration to both courts was the fact that the

nature of the felonies was not essential to establish the convictions.[149] Contrastingly, in this case the victims' identities, as well as other facts established by the disputed evidence, were essential to the State's case. Defendant's reliance upon Cook and Spletzer is unpersuasive since those cases involved evidence concerning collateral matters.

Given the facts of this case, it is clear that the prosecutorial need for most of the disputed evidence was significant since it established essential elements of the crimes with which defendant was charged. Defendant was not willing to stipulate to the State's proof, and submission of his affidavit did not have this effect. The probative value of this evidence simply was not outweighed by unfair prejudice.

■ However, three of the State's exhibits (photographs) that defendant challenges are inadmissible under our prior cases. All three of those photographs show Graeme Cunningham's head wounds. The first was taken from the top of the head, looking down toward the nose. It shows two open wounds: one gash on the top of the head and another gash running between the top of the head and the eye. The picture also shows wet hair surrounding the gashes and discoloration across the face. The second photograph shows a gash surrounded by wet, matted hair. The wound is on the back of the head near a discolored ear. The third picture shows a hole in the skull and a pair of tongs pulling skin away from the opening to reveal the brain cavity. The wet hair surrounding the wound appears to be matted with blood.

The three photographs of Graeme's head were improperly admitted under rule 403 and under our decisions in Cloud and Garcia. This evidence had minimal probative value, being essentially cumulative of unchallenged expert and lay testimony identifying the remains and the causes of

---

**145.** United States v. Peltier, 585 F.2d 314, 325 (8th Cir.1978), cert. denied, 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979).

**146.** See O'Shea, 724 F.2d at 1516.

**147.** 535 F.2d 950.

**148.** 538 F.2d 1000 (3d Cir.1976).

**149.** 538 F.2d at 1004–05; 535 F.2d at 956.

death. In fact, two of the three photographs apparently had no probative value. The medical examiner testified on direct examination that all of the wounds shown, except the hole in the skull, could have occurred in the stream after the boy's body was left there. On the other hand, having seen the photographs, it is evident to us why the prosecution resisted their exclusion. Cumulatively and individually, the photographs had great potential for unfairly prejudicing defendant. The State either should have proceeded without the evidence or should have been compelled to stipulate to the facts shown. For these reasons, we hold that the trial court erred in admitting the photographs described above.

■ Although we have either assumed (part XA) or concluded (part XB) that the trial court abused its discretion in admitting the described photographs, we find the error harmless. In *State v. Banner*,[150] we applied rule 30 of the Utah Rules of Criminal Procedure to nonconstitutional evidentiary error.[151] That rule directs in part, "Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded." To the same effect is rule 103(a) of the Utah Rules of Evidence.

The Court in *State v. Knight*[152] unanimously held that whether reversible error occurs under rule 30 is determined by applying the test found in *State v. Fontana*.[153] In *Fontana*, we held that "affect the substantial rights of a party" means that an error warrants reversal "only if a review of the record persuades the [C]ourt that without the error there was 'a reasonable likelihood of a more favorable result for the defendant.' "[154] In *Knight*, the Court adopted an "erosion-of-confidence" criterion to give substance to our "reasonable likelihood" standard.[155] We stated

that for an error to require reversal, the likelihood of a different outcome must be sufficiently high to undermine our confidence in the verdict.[156]

Application of the standard to the case at hand invariably leads to the conclusion that the error was harmless. The photographs were inflammatory and had significant power to prejudice the jury unfairly. However, in light of defendant's gruesome confession, detailing how he brutally murdered the victims, we are convinced that the jury would have returned the verdicts of guilt and the death sentences had the photographs been excluded.

## XI. CORPUS DELICTI OF FIRST DEGREE MURDER

■ Defendant's thirteenth point is that the trial court erred by denying his motion to dismiss the allegations of aggravating circumstances contained in each of the charged homicides.

The informations under which defendant was charged alleged that the homicides were aggravated because they occurred during the commission or attempted commission of kidnapping, attempted kidnapping, or sexual abuse of a child; because they were committed to silence a witness; or because they were committed in an especially heinous manner. Defendant twice brought a motion to dismiss the aggravating circumstances. He argued that since aggravation is an element of the corpus delicti of first degree murder and since the State had insufficient evidence of aggravation aside from defendant's confession, the circumstances should have been dismissed and the charges reduced to second degree murder. The court denied the motions.

This Court has ruled that a confession is insufficient to support a conviction absent independent evidence of the corpus delicti

150. 717 P.2d 1325 (Utah 1986).

151. *Id.* at 1335.

152. 734 P.2d 913, 919 (Utah 1987).

153. 680 P.2d 1042 (Utah 1984).

154. *Id.* at 1048 (citations omitted); *cf. Tillman*, at 555–56 (test to determine whether alleged prosecutorial misconduct arises to reversible error).

155. 734 P.2d at 920.

156. *Id.*

of the charged crime.[157] To satisfy this doctrine, the State need only present evidence that the injury specified in the crime occurred and that it was caused by someone's criminal conduct.[158] The corpus delicti of murder has two components: (1) proof that the victim is actually dead, and (2) proof that the death was caused by criminal means.[159] In *State v. Cooley*,[160] we reiterated that the State had to establish the corpus delicti by clear and convincing evidence.[161]

Defendant's contention that aggravating circumstances alleged in a first degree murder indictment or information are part of the corpus delicti of the crime ignores our definition of that term.[162] Defendant, however, argues that this Court has never addressed the issue of whether the corpus delicti of first degree murder differs from that of second degree murder. He further contends that the intent to commit a homicide must be proved by evidence independent of a defendant's confession or admission.

We affirm the following language from *State v. Petree:*[163]

In this case, the "injury" in the first part of the definition [of the corpus delicti] is the death of a human being. As for the second requirement, it is unnecessary to show cause of death or to provide evidence on the specific degree of homicide. The State need only present evidence that the death resulted from criminal conduct rather than by accident or from natural causes. "The criminal agency causing death may be proved by circumstantial evidence and the reasonable inferences to be drawn therefrom." *People v. Miller*, 71 Cal.2d 459, 78 Cal.Rptr. 449, 459, 455 P.2d 377, 387 (1969). That was done in this case. The concealment of the skeletal remains and the unnatural

position of the body provided sufficient evidence from which the jury could conclude that Phyllis Ady died from criminal activity.[164]

This passage demonstrates that the intent to commit murder need not be proven by evidence independent of a defendant's confession and supports our decision to follow the majority view that aggravating circumstances are not part of the corpus delicti of first degree murder. Because there was clear and convincing evidence that the five boys died by criminal means, the trial court did not err by denying defendant's motion.

## XII. SUFFICIENCY OF THE AGGRAVATING CIRCUMSTANCES EVIDENCE

Defendant's fourteenth point on appeal is that the State had a duty to prove each of the aggravating circumstances alleged in Count I of the five informations beyond a reasonable doubt at trial. Defendant's claim is that he is entitled to unanimous verdicts on his first degree murder convictions and that the jury's use of general verdicts precludes this Court from insuring unanimity since the verdicts do not reveal which aggravating circumstance or circumstances were relied upon by the jury to convict him. He also contends that his murder convictions can be upheld only if the record contains sufficient evidence to support each alleged aggravating circumstance. He claims that because the evidence is insufficient to prove each of the circumstances underlying each of his first degree murder convictions, he is entitled to reversal of those convictions.

Notwithstanding this Court's division over the unanimity rule,[165] the Court is

157. *State v. Knoefler*, 563 P.2d 175, 176 (Utah 1977).

158. *State v. Kimbel*, 620 P.2d 515, 517 (Utah 1980); *Knoefler*, 563 P.2d at 176.

159. *State v. Rebeterano*, 681 P.2d 1265, 1267 (Utah 1984).

160. 603 P.2d 800 (Utah 1979).

161. *Id.* at 801.

162. *See supra* note 158 and accompanying text.

163. 659 P.2d 443 (Utah 1983).

164. *Id.* at 444.

165. *See Tillman*, 750 P.2d 546.

unpersuaded by defendant's claims in this case. In *State v. Tillman*,[166] two members of the Court held that jury unanimity on the evaluating circumstances is not required so long as the evidence supports the conviction with the alternative circumstances aggravating the crime charged,[167] as is the case here. Furthermore, Associate Chief Justice Stewart noted in *Tillman* that in his view, the specific instructions given to the jury required it to "act with the requisite unanimity"[168] and any error was harmless because there was "no real dispute" that the defendant in fact committed the aggravating circumstances charged.[169] Here, the trial court gave the jury general unanimity instructions that parallel the instructions used in *Tillman.*

■ Moreover, because of the posture of this case, the Court's division in *Tillman* need not be repeated here. The five informations alleged aggravated kidnapping as an aggravating circumstance for the first degree murder charges. Defendant was also charged in each of the informations with one count of aggravated kidnapping. The jury returned unanimous guilty verdicts on each of those charges. Clearly, then, the jury unanimously found that defendant killed each of his victims at least in the perpetration of an aggravated kidnapping. And a review of the evidence and all inferences which can be reasonably drawn therefrom in the light most favorable to the jury's verdicts[170] supports the conclusion that sufficient evidence exists in the record to support the five aggravated kidnapping circumstances charged. In light of the above, we conclude that defendant's point is without merit.

## XIII. CHARGE OF SEXUAL ABUSE

■ Defendant's fifteenth point is that he was improperly charged and convicted of sexual abuse of a child and that this error compels the reversal of his murder and aggravated kidnapping convictions.

Defendant, by pretrial motion, sought to be charged with sexual exploitation of a minor[171] instead of sexual abuse of a child[172] in the case involving Graeme Cunningham. Defendant argued that the State's evidence would show only that defendant took nude photographs of Graeme, and therefore sexual exploitation was the more specific offense and the offense with the lesser punishment. Defendant also argued that the taking of nude photographs of Graeme did not constitute the taking of indecent liberties with a child for purposes of the sexual abuse statute.

The State responded that defendant had mischaracterized its evidence, that the taking of nude photographs as proscribed in the sexual exploitation statute was different than the taking of lewd photographs under the enhancement provisions of the sexual abuse statute, and that the crime of sexual exploitation was designed to criminalize commercial production of child pornography.

The court ruled that the motion was premature. Defendant renewed his motion at the conclusion of the State's case, and it was denied.

Defendant relies on *State v. Shondel* ("[W]here there is doubt or uncertainty as to which of two punishments is applicable to an offense an accused is entitled to the benefit of the lesser.");[173] *Perry v. Pioneer Wholesale Supply Co.* ("When two statutory provisions appear to conflict, the more specific provision will govern over the

**166.** *Id.*

**167.** *Id.* at 566; *id.* at 582 (Howe, J., concurring in the result).

**168.** *Id.* at 577, 579–80 (Stewart, Associate C.J., concurring and concurring in the result).

**169.** *Id.* at 580 n. 1 (Stewart, Associate C.J., concurring and concurring in the result).

**170.** *State v. Booker,* 709 P.2d 342, 345 (Utah 1985) (citing *Petree,* 659 P.2d at 444); *see also*

*State v. McCardell,* 652 P.2d 942, 945 (Utah 1982).

**171.** Utah Code Ann. § 76–5a–3 (Supp.1983) (amended 1985).

**172.** Utah Code Ann. § 76–5–404.1 (Supp.1983) (amended 1984).

**173.** 22 Utah 2d 343, 346, 453 P.2d 146, 148 (1969) (footnote omitted).

more general provision."); [174] *Murray City v. Hall* (Where an irreconcilable conflict exists between new provisions and prior statutes relating to the same subject matter, the new provision will control.); [175] and *State v. Clark* (as long as the classifications are not arbitrary, the fact that conduct may violate both a general and a specific provision does not render the legislation unconstitutional, even though one violation is subject to a greater sentence) [176] in support of his contention that he should have been charged with sexual exploitation of a minor instead of sexual abuse of a child.

In 1983, subsection 76–5a–3(1)(a) (amended 1985) provided:

A person is guilty of sexual exploitation of a child:

When he knowingly produces, distributes or possesses with intent to distribute, material or a live performance depicting a nude or partially nude child for the purpose of sexual arousal of any person or any person's engagement in sexual conduct with the child.

The legislature explicated the purpose of this statute in Utah Code Ann. § 76–5a–1 (Supp.1983) (amended 1985):

The legislature of Utah determines that the sexual exploitation of children under the age of 14 is excessively harmful to their physiological, emotional, social, and mental development; that children under the age of 14 cannot intelligently and knowingly consent to sexual exploitation; that regardless of whether it is classified as legally obscene, material that sexually exploits children is not protected by the First Amendment of the United States Constitution or by the First or Fifteenth sections of Article I of the Utah Constitution and may be prohibited; and that prohibition of and punishment for the distribution and production of materials that sexually exploit children is necessary and justified to eliminate the market for those materials and to reduce the harm to the child inherent in perpetuation of the record of his sexually exploitive activities. It is the purpose of this act to prohibit the production and distribution of materials which sexually exploit children under the age of 14, regardless of whether the materials are classified as legally obscene.

■ Comparison of subsection 76–5a–3(1)(a) in light of its legislative purpose with the sexual abuse of a child statute [177] reveals that the two statutes were not designed to proscribe parallel conduct. The essence or gravamen of the sexual exploitation statute at issue is the production, distribution, or possession with intent to distribute materials depicting nude or partially nude children. The statute was intended, in substantial part, to eliminate the market for such materials by proscribing their manufacturing and marketing. Conversely, the sexual abuse statute proscribes conduct involving the touching of children and the taking of indecent liberties with children.

■ In the instant case, the information charging defendant with sexually abusing Graeme additionally alleged that defendant "used, showed, or displayed pornography or caused the victim to be photographed in a lewd condition during the course of the offense." This added "circumstance" was charged, with others, not because it was a substantive element of the crime of sexual abuse of a child, but rather, to support the imposition of a minimum mandatory sentence.[178] Thus, although the sexual exploitation statute did include, in relevant part, the act of photographing nude "children" as part of the substantive offense, the sexual abuse of a child statute did not do so. Furthermore, we believe that the act of photographing "nude children" under the provisions of the sexual exploitation stat-

---

174. 681 P.2d 214, 216 (Utah 1984) (citation omitted).

175. 663 P.2d 1314, 1318–19 (Utah 1983) (quoting 2A, C. Sands, *Sutherland Statutory Construction* § 51.02, at 290 (4th ed. 1973)).

176. 632 P.2d 841, 844 (Utah 1981).

177. *See infra* p. 484.

178. Utah Code Ann. § 76–5–404.1(3)(d), (4) (Supp.1983) (amended 1984).

ute at issue is different from photographing young children in a "lewd condition" pursuant to the sexual abuse statute. In conclusion, the substantive portions of the two statutes in issue, subsections 76–5–404.1 and 76–5a–3(1)(a), do not overlap in the *Shondel* or *Perry* sense.

Defendant, however, claims that it was error to submit the sexual abuse of a child charge to the jury because his conduct did not come within the phrase "otherwise takes indecent liberties with a child." He argues that touching or conduct of some greater magnitude is required to support a conviction pursuant to the "indecent liberties" language in section 76–5–404.1 and that photographing Graeme was not serious enough to constitute such conduct. Conversely, defendant argues that the statements from his confession undisputedly indicate that he never touched Graeme while the boy was alive, nor did he admit that he had Graeme touch himself, defendant, or any other person. Thus, the contention is that since the statements from his confession, the nude photographs of Graeme, and the testimony of the other youths who were sexually abused by defendant were the only evidence to support the charge, he was improperly convicted thereon because that evidence does not establish that he touched Graeme while the child was alive.

▮ In view of defendant's argument, we must address whether his conduct fell within the substantive provisions of the Sexual Abuse of a Child Statute (whether the evidence is sufficient to support the sexual abuse conviction). The prosecution apparently relied exclusively on an "indecent liberties" theory at trial to establish proof of guilt on the sexual abuse charge:

> That leads us to the last crime charged, and again this crime is charged only as to Graeme Cunningham. Again, a change in the legislature [sic] made it possible to charge this particular crime, sexual abuse of a child. That's instruc-

tion No. 41. Let me just read part of it. These are elements of a crime of sexual abuse of a child:

> "That on or about the 14th day of July, 1983, in Salt Lake County, State of Utah, Arthur Gary Bishop touched the buttocks or genitalia of Graeme G. Cunningham or otherwise took indecent liberties."

> I want to comment on that. You don't have to touch the buttocks or genitalia. You can take indecent liberties. And that's the key to the charge, indecent liberties.

Accordingly, the question is whether the evidence is sufficient to sustain the sexual abuse of a child conviction on an indecent liberties theory.

▮ Defendant relies on *In re J.L.S.*,[179] wherein this Court held, "The momentary touching or grabbing of the clothed breasts of an adolescent [chambermaid] by a seventeen year old boy does not come within the phrase 'otherwise takes indecent liberties with another.' "[180] In so holding, we recognized:

> In an interpretation of Section 76–5–404(1) [forcible sexual abuse], the format of the statute is significant. In the first part, the legislature describes in detail the specific conduct proscribed, viz., the actor's touching the anus or genitals of another. In the second part, which is separated from the first by the disjunctive "or" the conduct condemned is set forth in generalized terms, viz., "otherwise takes indecent liberties with another." *The use of the disjunctive in combination with term "otherwise" is indicative of an intent to proscribe the type of conduct of equal gravity to that interdicted in the first part, although the acts are committed in a different way or manner than that set forth in the first part.*[181]

We followed *In re J.L.S.* in deciding *In re L.G.W.*,[182] where we stated that the brief touching of the clothed buttocks of an

---

**179.** 610 P.2d 1294 (Utah 1980).

**180.** *Id.* at 1296.

**181.** *Id.* at 1295 (emphasis added; footnote omitted).

**182.** 641 P.2d 127 (Utah 1982).

adult woman did not amount to forcible sexual abuse.[183] Defendant has concluded that the analysis and holdings of the above authority support his view that an "indecent liberty" under the sexual abuse of a child statute must involve some touching of or by the victim. We disagree.

Where young child victims have been involved, this Court has reviewed challenges by defendants convicted of forcible sexual abuse who claim that their conduct did not constitute an "indecent liberty" by viewing the defendant's acts in relationship to the surrounding circumstances; we have not merely determined whether a touching occurred.

We applied this principle in State v. Thatcher,[184] where we affirmed a father's forcible sexual abuse conviction for having taken "indecent liberties" with his twelve-year-old daughter.[185] There, we held: "The totality of the facts in this case at once suggests the inapplicability of those cases [In re J.L.S. and In re L.G.W.] on their facts."[186] The Court focused upon several factors in making this determination: (1) the nature of the victim's participation (whether the defendant required the victim's active participation), (2) the duration of the defendant's acts, (3) the defendant's willingness to terminate his conduct at the victim's request, (4) the relationship between the victim and the defendant, and (5) the age of the victim.[187]

The reasons for considering, in addition to the defendant's acts, the characteristics of the victim and the relationship between the victim and the defendant in determining whether "indecent liberties" were taken with a young child are not difficult to understand. The younger the victim, the more susceptible he or she is to suffering long-term physiological, emotional, social, and mental harm.[188] Moreover, young child victims often do not understand that the behavior to which they are being subjected is both legally and morally wrong.

The relationship between a young child victim and a defendant is particularly significant since the closer that relationship is, the more influence the defendant can exert over the victim. This influence may in fact be used by the defendant to prevent others from discovering his illegal acts. Finally, when the victim has a close relationship with the defendant and such acts are uncovered, the child feels that his or her trust has been betrayed.

Even in J.L.S., where we dealt with the forcible sexual abuse statute (section 76–5–404), as opposed to the sexual abuse of a child statute (section 76–5–404.1), we recognized that a distinction existed in applying the phrase "indecent liberties" to young children:

The term "indecent liberties" was used but in a different context in the prior Penal Code, which was repealed in 1973. Section 76–7–9 stated.

Every person who shall assault a child, whether male or female, under the age of fourteen years, and shall take indecent liberties with or on the person of such child, without committing, intending or attempting to commit the crime of rape, upon such child, with or without the child's consent, is guilty of a felony.

In defining the term "indecent liberties" under this prior statute this Court explained:

. . . the term "indecent liberties," as used in the statute is clearly self-defining. . . . We think that every person of the most ordinary intelligence and understanding, who is familiar with merely the rudiments of the English language, understands what is meant when he, or anyone else, is charged with having taken indecent liberties with the person of a child.

. . . .

---

183. Id. at 129; accord State v. Brickey, 714 P.2d 644, 645 n. 2 (Utah 1986).

184. 667 P.2d 23 (Utah 1983) (per curiam).

185. Id. at 24, 25.

186. Id. at 24.

187. Id. at 24–25.

188. Cf. Utah Code Ann. § 76–5a–1 (Supp.1987).

In *State v. Macmillan* [189] this Court stated that in a statute like 76–7–9 the terms "indecent liberties" and ["]indecent assault" were convertible. However, this statute dealt specifically with an indecent assault upon a child under the age of fourteen. This Court in stating the term "indecent liberties" was self-defining was determining the meaning within the context of the statute, viz., one of the elements of the crime was the age of the victim. Without reading the term "indecent liberties," in conjunction with the age of the victim, the precision required for a penal statute would not be manifest; as indicated by this Court in its statement in Macmillan, viz., every person of ordinary intelligence understands what is meant when he is charged with having taken indecent liberties with the person of a child.

In the present statute 76–5–404(1), the term "indecent liberties" cannot derive the requisite specificity of meaning required constitutionally, by being read in conjunction with the age of the victim, but if it be considered as referring to conduct of the same magnitude of gravity as that specifically described in the statute, the potential infirmity for vagueness is rectified.[190]

Turning to the facts of this case, we conclude that defendant's acts of inducing Graeme to disrobe for the illicit photo session, when viewed with the evidence of defendant's criminal intent, constituted taking "indecent liberties with a child." [191] In so concluding, we note that defendant induced Graeme to remove his clothing and pose for the photographs, despite the fact that the boy was "really reluctant" and the fact that even after the youth had agreed to disrobe in exchange for a new skateboard, "it took him a while to get the courage to … undress or anything." The encounter between Graeme and defendant was not momentary or between strangers.[192] And if Graeme had not been so young, he may have not been so susceptible to defendant's inducements and his brutal attack.

We conclude that the evidence supports defendant's conviction on the sexual abuse of a child charge and thus find his point to be without merit. Moreover, because defendant was properly charged and convicted of sexual abuse of a child and because this Court should hold that the testimony of the six boys was properly admitted,[193] defendant's aggravated kidnapping and murder convictions should be affirmed.

## XIV. CONSTITUTIONALITY OF THE SEXUAL ABUSE STATUTE

Defendant's sixteenth point is that the enhancement provision of Utah Code Ann. § 76–5–404.1 (Supp.1983) (amended 1984) is unconstitutional on its face and was unconstitutionally applied by the trial court. As previously indicated, defendant was charged with sexually abusing Graeme Cunningham in violation of section 76–5–404.1. The information additionally alleged that the offense was committed in conjunction with one or more of the following circumstances taken from subsection 76–5–404.1(3):

(1) The offense was committed by force, duress, violence, intimidation, coercion, menace or threat of harm or was committed during the course of a kidnapping.

(2) The defendant used, showed, or displayed pornography or caused the victim to be photographed in a lewd condition during the course of the offense.

(3) The defendant committed more than (5) separate offenses under the above section (76–5–404.1) before or after the instant offense.

---

**189.** 46 Utah 19, 22, 145 P. 833, 834 (1913); *see also State v. Saunders,* 82 Utah 170, 22 P.2d 1043 (1933).

**190.** 610 P.2d at 1295–96 (footnotes omitted).

**191.** *See* Utah Code Ann. § 76–5–404.1 (Supp. 1983) (amended 1984).

**192.** *Compare In re L.G.W.,* 641 P.2d at 128–29, *and In re J.L.S.,* 610 P.2d at 1295–96, *with Thatcher,* 667 P.2d at 24–25.

**193.** *See infra* pp. 485–488.

Defendant brought a pretrial motion to dismiss these allegations on various grounds. The motion was denied. At trial, the State called six adolescent boys to testify regarding sexual improprieties defendant had taken with them. Defendant objected to this testimony for the same reasons as were advanced in the pretrial motion and also claimed that the testimony was inappropriate during the guilt phase of the trial. At the close of the State's case, defendant again made a motion to dismiss the allegations listed in the sexual abuse count. The motion was denied. Finally, defendant attacked section 76–5–404.1 in an unsuccessful motion for a new trial.

On appeal, defendant focuses his attack only upon subsection 76–5–404.1(3)(g) (Supp.1983) (amended 1984), under which the testimony of the boys was admitted. The State responds that this case should be analyzed pursuant to the 1984 version of the statute.

Utah Code Ann. § 76–5–404.1 was enacted March 9, 1983, and became effective May 10, 1983.[194] The statute was amended January 28, 1984, and the amendments became effective February 16, 1984,[195] nineteen days before the first witness was called by the State in defendant's trial. Defendant claims that analysis under the 1984 version of the statute would be improper because

(1) the defendant was charged under the 1983 statute and the state never moved to amend the information or try to take advantage of the new law, (2) the trial court had required all motions to be heard prior to thirty days before trial, requiring use of the then current 1983 statute, (3) neither the judge nor prosecutors, nor defense attorneys had knowledge of the amendments and all legal arguments and rulings prior to and during trial were based on the 1983 statute, and (4) post trial application of the 1984 statute would violate the prohibition against ex post facto laws.

The trial court ruled on and applied the 1983 version of section 76–5–404.1, and giv-

en the facts of this case, the 1983 version of the statute is the law under which defendant's conviction must be reviewed.

Defendant contends that the trial court erred by interpreting subsection 76–5–404.1(3)(g) such that the existence of circumstances enumerated in that subsection were to be found by the jury during the guilt phase of the criminal action.

In 1983, subsection 76–5–404.1 provided, in pertinent part:

(1) A person commits sexual abuse of a child, if, under circumstances not amounting to rape of a child, object rape of a child, or sodomy upon a child or an attempt to commit any of these offenses, the actor touches the anus, buttocks, or genitalia of a child who is under the age of 14, or touches the breast of a female child who is under the age of 14, or otherwise takes indecent liberties with a child, or causes a child to take indecent liberties with the actor or another, with intent to cause substantial emotional or bodily pain to any person or with the intent to arouse or gratify the sexual desire of any person regardless of the sex of any participant.

(2) Sexual abuse of a child is a felony of the first degree.

(3) Sexual abuse of a child is punishable, as a felony of the first degree, by imprisonment in the state prison for a term which is a minimum mandatory term of 3, 6, or 9 years and which may be for life when any of the following circumstances have been charged and admitted or found true in the action for the offense:

. . . .

(g) The convicted person committed more than five separate offenses under this section at the same time, or during the same course of conduct, or before or after the instant offense. . . .

The 1983 version of this statute provided that the existence of the circumstances were to be found in the "action for the

**194.** Act of March 9, 1983, ch. 88 § 24, 1983 Utah Laws 403, 416–17.

**195.** Act of January 28, 1984, ch. 18 § 10, 1984 Utah Laws 68, 77–78.

offense." Defendant argues that since seven of the nine subsections in the statute were prefaced with the phrase "convicted person," the phrase "action for the offense" must have contemplated a post-conviction hearing at which the presence of the circumstances was to be determined with respect to a previously convicted defendant. Defendant also argues that the prosecution had the burden of establishing the circumstances at this post-conviction hearing. Defendant's brief claims that the following procedure was required:

(1) [A] jury determination (unless bench trial) of innocence or guilt on the substantive offense based solely on evidence relevant to that charge;

(2) [A]fter return of a guilty verdict (a not guilty verdict having concluded the matter as would a conviction on a lesser included offense), presentation to fact-finder of evidence regarding basis of enhancement;

(3) [A] finding by fact-finder that the allegation is or is not proven (which although unstated ought to be beyond a reasonable doubt);

(4) [C]onsideration by the court of matters in aggravation or mitigation as may be presented in a pre-sentence report or through evidence in a sentencing hearing; and

(5) [I]mposition of sentence upon the defendant.

When construing a statute, our duty is to give effect to the plain and obvious language chosen by the legislature unless it is inconsistent with that body's intent.[196] When uncertainty in statutory language exists, this Court must look to other sources for guidance.[197] Thus, the determination to be made is whether the enhancement provision of the 1983 statute was ambiguous.

The word "offense" is generally defined in the Utah Criminal Code as "a violation of any penal statute...."[198] Although the Utah Code of Criminal Procedure defines the phrase "criminal action," that definition is limited to that code by its terms.[199] Applying commonly used definitions of "action" in the criminal context (e.g., *"criminal action.* Proceeding by which person charged with a crime is brought to trial and either found not guilty or guilty and sentenced."[200]) offers some support to defendant's argument that the statutory language was broad enough to include a post-conviction hearing. However, when the language is taken in context, it is ambiguous. This is so because two of the enumerated circumstances in subsection (3) did not lend support to such a construction;[201] the legislature omitted the term "convicted person" in subsections (3)(a) and (3)(h). Therefore, it is proper to look to other sources to ascertain legislative intent (i.e., historical background of enactment, objectives attending passage, the circumstances to be accomplished, and the effect the statute may have under various construction suggestions).[202]

Our research has yielded little useful history on the 1983 version of section 76–5–404.1. It is noteworthy that from the time of the statute's enactment to the present, neither the Utah Criminal Code nor the Utah Code of Criminal Procedure has provided for a separate hearing to determine the existence of the circumstances found in subsection (3) of section 76–5–404.1. Moreover, critical review of the Act out of which the statute arose does not support the post-conviction hearing espoused by defendant.

---

196. *State v. Rodrigues,* 706 P.2d 1293, 1297–98 (Haw.1985); *see also supra* note 97.

197. *Rodrigues,* 706 P.2d at 1297–98.

198. Utah Code Ann. § 76–1–601(6) (1978).

199. Utah Code Ann. § 77–1–3(1) (Supp.1987).

200. Black's Law Dictionary 336 (rev.5th ed. 1979).

201. A fundamental principle of statutory construction is that a statute should be construed as a whole. *Utah State Rd. Comm'n v. Friberg,* 687 P.2d 821, 831 (Utah 1984) (plurality opinion).

202. *See id.; State v. Thompson,* 237 Kan. 562, 563, 701 P.2d 694, 696 (1985); *Sager v. McClenden,* 296 Or. 33, 36, 672 P.2d 697, 699 (1983).

Chapter 88 of the 1983 Laws of Utah, in addition to creating section 76–5–404.1, amended Utah Code Ann. § 76–3–201 (1978) by adding subsection (5).[203] This provision allowed for the submission of a statement of circumstances in aggravation or mitigation of the crime after trial and before sentencing and further provided for judicial consideration of these circumstances at the sentencing hearing to determine *which minimum mandatory sentence should be imposed.*[204] Implicit within this provision is the determination that the trier of fact has found the defendant guilty of a crime and has found the existence of a circumstance such that a minimum mandatory sentence must be imposed. Notwithstanding this implication, the section was silent concerning a post-conviction hearing at which the trier of fact was to determine aggravating circumstances.

Additionally, subsection 76–3–201(10) was amended by chapter 88. That provision stated, in pertinent part, that should the trier of fact find the defendant to have caused "substantial bodily injury," at trial the defendant must be sentenced to the aggravated mandatory term.[205] The bodily injury circumstance that the jury had to have found for the provision to apply was found at subsection 76–5–404.1(3)(b) ("the convicted person caused bodily injury or severe psychological injury to the victim during or as a result of the offense"). Surely the legislature did not intend to create a bifurcated trial of fact on issues as closely related as those in subsection 76–3–201(10) and subsection 76–5–404.1(3)(b). The addition of these provisions is persuasive evidence that the legislature intended the trier of fact to determine the

existence of the circumstances found in subsection 76–5–404.1(3) during the guilt phase of a criminal action prosecuted pursuant to the 1983 version of the statute.

When a statute is amended, the amendment is persuasive evidence of the legislature's intent when it passed the former, unamended statute.[206] In 1984, the legislature passed chapter 18, entitled "Clarifying Child Kidnapping and Sexual Abuse Act."[207] Indeed, the bill's sponsors characterized the act as "basically a housekeeping bill with one substantive modification."[208]

While the 1984 act did not affect subsection 76–3–201(10), it did delete a portion of subsection (5), which had previously allowed the State or the defendant to dispute aggravating or mitigating facts in the record or probation officer's report.[209] This further narrowing of subsection (5) lends additional support for the conclusion that the legislature intended the trier of fact to be the ultimate fact finder of the circumstances found in subsection (3) of the 1983 version of section 76–5–404.1.

Much more significant were the amendments made to subsection 76–5–404.1(3). The phrase "convicted person" was substituted with the term "accused" in all seven paragraphs where the former phrase had been used. And under the 1984 version of section 76–5–404.1, it is clear that the fact finder is to determine the existence of the enumerated circumstances at trial. Pursuant to the principles discussed above, it appears that when read in the context of the Code and subsequent legislation, the phrase "convicted person" in the 1983 statute, although being a poor choice of words,

203. Act of March 9, 1983, ch. 88 § 3, 1983 Utah Laws 403, 405–07.

204. *Id.* (current version at Utah Code Ann. § 76–3–201(5) (Supp.1987)).

205. *Id.* at 407 (current version at Utah Code Ann. § 76–3–201(6)(c) (Supp.1987)).

206. *State v. Barnett,* 142 Ariz. 592, 596, 691 P.2d 683, 687 (1984) (en banc); *see also Ropfogel v. Enegren,* 7 Kan.App.2d 644, 646 P.2d 1138, 1139–40 (1982); *Board of City Comm'rs v. CMC of Nev., Inc.,* 99 Nev. 739, 795, 670 P.2d 102, 106 (1983).

207. Act of January 28, 1984, ch. 18, 1984 Utah Laws 68. The title given an act may also be used to ascertain the legislature's intent in passing the act. *Cf. Barnett,* 142 Ariz. at 597, 691 P.2d at 688.

208. Minutes of the Judicial Interim Study Committee Meeting held December 7, 1983, item No. 4 (approved Jan. 4, 1984).

209. Act of January 28, 1984, ch. 18 § 1, 1984 Utah Laws 68, 70–71.

must be read to be consistent with the 1984 version of the statute; the legislature's words must be read as referring to subsection 76–5–404.1(1) and the requirement that the defendant committed the prohibited act with the requisite mens rea.

In summary, the 1984 modifications and other sources indicate that the legislature intended that the presence of the triggering circumstances under the 1983 version of the Code be determined by the fact finder at trial. Since the trial court applied the statute consistently with this interpretation, we should not hold that it erred in applying the statute.

■■■ Defendant further claims that subsection (3)(g) suffers from various constitutional infirmities. Defendant first contends that the provision violates the due process clause. The essence of defendant's argument appears to be that the subsection interferes with his right to a fair trial.

Defendant's point is without merit. In *McMillan v. Pennsylvania*,[210] the United States Supreme Court said: "[W]e should hesitate to conclude that due process bars the State from pursuing its chosen course in the area of defining crimes and prescribing penalties."[211] The state legislature has chosen to have the jury consider the circumstances found in subsection (3)(g) at trial. Allowing such evidence during the guilt phase of a criminal action is not patently offensive and is the procedure sometimes used in the other penal statutes.[212] Defendant was given notice of the charge in the information, as well as a list of the State's witnesses and the opportunity to impeach the testimony of the State's witnesses or offer evidence in rebuttal. The fact that some members of this Court might have drafted the statute in issue differently does not render the statute invalid as unconstitutional. This conclusion is not changed because the legislature has seen fit to allow the trier of fact to consider uncharged prior bad acts in the guilt phase of a criminal proceeding.[213] If a statute is constitutional, it is not proper for this Court to edit the legislature's work to conform the statute so that it reads in accordance with this Court's view on how the statute should have been drafted.

The legislature has made the determination that a defendant who has repeatedly committed crimes against persons and then violates section 76–5–404.1 poses a special threat to children. The statutory scheme evinces an intent to deal severely with such offenders by removing, for a specified period of time, the discretion of the trial court and the probation board to allow such offenders back into society.

■■■ Defendant next claims that the statutory scheme infringes upon the presumption of innocence. Defendant asks, "[H]ow can a court ever allow testimony that is exclusively relevant to punishment before an accused has been convicted?"

■■■ The presumption of innocence is a basic component of the fair trial secured by the fourteenth amendment to the United States Constitution.[214] It is a doctrine that allocates the burden of proof in criminal trials and also serves as an admonishment to the jury to judge an accused's guilt on the evidence adduced at trial.[215] *Estelle v. Williams*[216] warns that to assure the fair-

**210.** 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986).

**211.** *Id.* at ——, 106 S.Ct. at 2417.

**212.** *See, e.g., State v. McGrath*, 749 P.2d 631, 635–36 (1988) (construing Utah Code Ann. § 1603 (Supp.1986) (amended 1987)); *State v. Angus*, 581 P.2d 992, 995 (Utah 1978) (construing Utah Code Ann. § 76–3–203 (1978)); *United States v. Valdes–Guerra*, 758 F.2d 1411, 1413–14 (11th Cir.1985) (construing 31 U.S.C. § 5322(b); reporting violation as part of pattern of illegal activity)); *Fletcher v. State*, 472 So.2d 537, 539 (Fla.Ct.App.1985) (construing a sentence enhancement statute for wearing a hood, mask, or other device while committing an offense).

**213.** *See McGrath*, 749 P.2d at 635–36.

**214.** *Estelle v. Williams*, 425 U.S. 501, 503, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 (1976).

**215.** *Bell v. Wolfish*, 441 U.S. 520, 533, 99 S.Ct. 1861, 1871, 60 L.Ed.2d 447 (1979); *see also Taylor v. Kentucky*, 436 U.S. 478, 485, 98 S.Ct. 1930, 1935, 56 L.Ed.2d 468 (1978).

**216.** 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126.

ness of the fact-finding process, implementation of the presumption requires courts to be vigilant in assuring that guilt is established by probative evidence and beyond a reasonable doubt.[217]

As stated above, the legislature has determined that the repeat offender must be incarcerated for a determinate period. Subsection 76-5-404.1(3)(g) was drafted so as to afford a defendant the opportunity of having a jury determine the existence of the circumstances (the six separate offenses) under the most stringent burden of proof in the law. Evidence of these other offenses was regulated by the Utah Rules of Evidence and was relevant because of the method in which the statute was designed. As drafted, subsection (3)(g) promotes a legitimate legislative objective without undermining the principle that guilt must be established by probative evidence and beyond a reasonable doubt.

■■■ Defendant finally claims that section 76-5-404.1(3)(g) violates the prohibitions against ex post facto laws. He relies on that portion of the 1983 statute which provided for application of the minimum mandatory provisions if the person committed "more than five separate offenses *under this section* ... before ... the instant offense." The argument apparently is that only one of the boys who testified was victimized after the subsection came into effect on May 10 and that the trial court therefore erred by allowing into evidence the testimony of the other boys, who were victimized under section 76-5-404 (1978) (forcible sexual abuse). However, defendant's contention that the trial court's interpretation of the statute made punishment for the crime more burdensome after its commission does not follow.

The obvious intent of the legislature was to include unlawful conduct under former

statutes (e.g., section 76-5-404). The 1984 amendments enumerated in chapter 18 of 1984 Utah Laws support such a construction.[218] In any event, the statute in no way makes punishment more burdensome for acts perpetrated prior to enactment. Defendant was punished under section 76-5-404.1 for sexually abusing Graeme Cunningham and was accordingly convicted of a first degree felony. The circumstances did not alter the severity of the punishment to which defendant was subjected under the 1983 version of the statute. It merely limited the discretion of the trial court and the parole board.[219] Based upon the above discussion and after a review of defendant's arguments under Rules 404(b), 403, and 401 of the Utah Rules of Evidence, defendant's argument is without merit.

## XV. DEPRAVED INDIFFERENCE MURDER INSTRUCTION

■■■ Defendant's seventeenth point is that the trial court erred by refusing to give his depraved indifference murder instruction with respect to each killing.

Defendant's sole theory of the case was that he intentionally killed the five victims but that he did so under an extreme mental or emotional disturbance for which there was a reasonable explanation or excuse. At the conclusion of trial, defendant requested a second degree murder instruction for each of the five killings that included the depraved indifference variation of that offense.[220] Over defendant's objection, the court limited the second degree murder instructions to the "knowingly and intentionally" variation of that offense.[221]

■■■ In *State v. Baker*,[222] this Court enunciated the standards to be used for determining whether a jury should be instructed on lesser included offense(s). If a

**217.** *Estelle,* 425 U.S. at 503, 96 S.Ct. at 1692; *see also Taylor,* 436 U.S. at 483, 98 S.Ct. at 1933.

**218.** *See supra,* pp. 486–487.

**219.** *See McMillan,* 477 U.S. at ——, 106 S.Ct. at 2417–18. Defendant's additional contention that there was limited "trial energy to be focused on the five separate charges" at his trial is also without legal merit.

**220.** *See* Utah Code Ann. § 76-5-203(1)(c) (Supp. 1983) (amended 1986).

**221.** *See* Utah Code Ann. § 76-5-203(1)(a) (Supp. 1983) (amended 1986).

**222.** 671 P.2d 152 (Utah 1983).

defendant requests a lesser included instruction, as was the case here, an evidence-based standard controls.[223] To determine whether an offense is included in a charged offense, the trial court must first determine whether the offense is established by proof of the same or less than all the facts required to establish the commission of the offense charged.[224] If the same facts tend to prove elements of more than one statutory offense and the evidence is ambiguous and susceptible to alternative explanations, the trial court must give the lesser included offense instruction if any one of the alternative interpretations provides both a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense.[225]

We have previously determined that depraved indifference murder is a lesser included offense of first degree murder.[226] Therefore, the first prong of the *Baker* test was satisfied.

By defense counsel's own concessions to the jury, the evidence plainly established that defendant intentionally killed his victims; had the jury believed defendant's experts concerning his extreme mental or emotional disturbance, it would have acquitted him of the capital offense and convicted him of manslaughter. The evidence simply was not ambiguous or susceptible to alternative interpretations with respect to defendant's intent. In other words, the mental state set forth in section 76-5-203(1)(c) as interpreted in *State v. Fontana*,[227] was not applicable to defendant's case under any reasonable interpretation of the evidence and was inconsistent with his theory of the case. Therefore, the trial court properly refused the instruction.

## XVI. CUMULATIVE ERROR

▮ Defendant's nineteenth and final point on appeal is that multiple errors prejudiced his right to a fair trial. " 'Cumulative error' refers to a number of errors which prejudice a defendant's right to a fair trial." [228] On the record before us, the concept does not apply.[229]

In several of defendant's points, he has relied nominally on state constitutional provisions while actually relying on parallel federal constitutional provisions and analysis based thereon. The following language from *Lafferty* is pertinent to those arguments:

> As *Tillman* implies, the mere mention of a claim of error unaccompanied by any legal argument is not necessarily enough, even in a death case, to require that we engage in a full-blown analysis of the claim. Unless the error is manifest on the record, not only must it be raised, but an argument must be briefed. This Court will not engage in constructing arguments out of whole cloth on behalf of defendants in capital cases. That is not to suggest, however, that if the issues were properly presented, we might not find some variance between the state and federal rights.[230]

We have reviewed defendant's other claims of error raised in the points above and have found them to be without merit.

Affirmed.

HOWE, J., concurs.

STEWART, Associate Chief Justice: (concurring in part and concurring in the result).

I concur in Justice Zimmerman's concurring opinion, except for his view that the admission of other crimes evidence constitutes a violation of the Due Process Clause of the Utah Constitution; and I concur in the opinion of Chief Justice Hall on all

**223.** *Id.* at 156–59.

**224.** Utah Code Ann. § 76–1–402(3)(a) (1978).

**225.** *State v. Oldroyd,* 685 P.2d 551, 553–54 (Utah 1984); *Baker,* 671 P.2d at 158–60.

**226.** *See State v. Crick,* 675 P.2d 527, 529–30 (Utah 1983).

**227.** 680 P.2d at 1045–46.

**228.** *State v. Rammel,* 721 P.2d 498, 501–02 (Utah 1986) (citation omitted).

**229.** *State v. Ellis,* 748 P.2d 188, 191 (1987) (citing *Rammel,* 721 P.2d at 502).

**230.** 749 P.2d at 1247 n. 5. (Citing *Tillman,* 750 P.2d at 553).

other issues, except for the construction his opinion places on the Utah manslaughter statute.

With respect to the construction of the manslaughter statute, I submit that the trial court erred in requiring that a mental or emotional disturbance be generated by a cause external to the defendant. I note here for the sake of clarity that Justices Durham and Zimmerman and I are in essential agreement on the proper construction of the Utah manslaughter statute.

At the time of trial, the Utah manslaughter statute provided in relevant part:

(1) Criminal homicide constitutes manslaughter if the actor:

....

(b) Causes the death of another under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation or excuse....

Utah Code Ann. § 76–5–205(1)(b) (1978) (amended 1985).

The jury instruction given by the trial court required that the mental or emotional disturbance under which the actor causes the death of another be "triggered by something external from the accused" and that the death not be "brought about by his own peculiar mental processes." In my view, the trial court's instruction was contrary to the plain language of the manslaughter statute. On its face, the statute is not limited to a mental or emotional disturbance caused by an external stimulus; rather, it expressly extends to *any* "mental or emotional disturbance for which there is a reasonable explanation or excuse." The manslaughter statute has been subsequently amended to change the requirement that the reasonableness of the defendant's explanation for the emotional disturbance be determined "from the viewpoint of a person in the actor's situation under the circumstances as he believe[d] them to be," Utah Code Ann. § 76–5–205 compiler's notes (1978). The plain language of the statute clearly contemplates that emotional disturbances may be triggered by either internal or external stimuli.

This construction of the statute does not transform the standard for determining when a homicide is manslaughter into a subjective one, as argued by the opinion of Chief Justice Hall. "The ultimate test ... is objective; there must be a 'reasonable' explanation or excuse for the actor's disturbance." II Model Penal Code and Commentaries § 210.3, at 50 (A.L.I.1980). "Where there is evidence of extreme mental or emotional distress, it is for the trier of fact to decide, in light of all the circumstances of the case, whether there exists a reasonable explanation or excuse for the actor's mental condition." *Id.* at 61. That determination is objective because the defendant's mental or emotional condition must be based on a reasonable excuse or explanation. It is not sufficient that the defendant acted out of extreme mental or emotional distress alone, regardless of whether the distress or disturbance was excusable. *See,* Note, *Utah's Manslaughter Statute: Walking the Tightrope Between Social Utility and Fair Culpability Assessment,* 1986 BYU Law Rev. 165, 175 (1986). There are numerous examples of internal "triggers" short of insanity, some of which are suggested in Justice Durham's opinion, which aptly demonstrate the soundness of a literal reading of the statute.

The defendant asserts that the erroneous instruction effectively prevented the jury from considering his theory of the case. Defendant's theory of the case was that his homosexual pedophilia was a mental or emotional disturbance which established a reasonable explanation or excuse for his conduct. The defendant had every right to have his legal theory presented to the jury, as long as it embodied a correct statement of the law and there was some evidence to support it. This Court has held on numerous occasions that each party is entitled to have the jury instructed on the law applicable to its theory of the case if there is any reasonable basis in the evidence to justify it. *E.g., State v. Torres,* 619 P.2d 694 (Utah 1980). Both Dr. Washburn and Dr. Greer testified in support of defendant's theory that he was a homosexual pedophile. Therefore, the issue, as I see it, is whether

homosexual pedophilia is an emotional or mental disturbance within the meaning of the statute.

Therefore, even though the trial court erred in its manslaughter instruction, the error was harmless because the defendant had no factual basis on which the jury could have convicted of manslaughter. In my view, pedophilia does not, as a matter of law, provide a reasonable explanation or excuse for killing.

Finally, I note that although Justice Zimmerman concludes that the admission of evidence of other crimes constitutes a violation of the Due Process Clause of the Utah Constitution, Article I, Section 7, I do not believe it is necessary to reach that issue, and I would not do so.

DURHAM, Justice: (concurring separately).

I join Justice Zimmerman's opinion except insofar as he joins Justice Stewart's opinion on the issue of the manslaughter instruction. I also decline to join in the following portions of Chief Justice Hall's opinion for the reasons explained below.

*Manslaughter Instructions* (§ IX)

The jury convicted defendant of first degree murder, an element of which was intentional killing. By virtue of the sequencing of instructions, the jury was told to consider the lesser included offense of manslaughter if, and only if, it failed to find that all of the elements of first degree murder or second degree murder existed beyond a reasonable doubt.[1] Having found first degree murder, the jury rendered moot the claimed error in the manslaughter instructions. Therefore, I believe that the Chief Justice's opinion improperly reaches the issue of the content of the manslaughter instructions and that those portions of the opinion are pure dicta. *See State v. Valdez*, 30 Utah 2d 54, 58, 513 P.2d 422, 424 (1973); *State v. Gallegos*, 16 Utah 2d 102, 104–05, 396 P.2d 414, 416 (1964).

Furthermore, contrary to the conclusion of the Chief Justice's opinion, I think that part of the challenged instruction was erroneous. The instruction says, "Such [extreme mental or emotional] disturbance therefore cannot have been brought about by his *own peculiar mental processes* or by his own knowing or intentional involvement in another crime." Instruction No. 28 (emphasis added). I submit that the sustaining of this language by the Chief Justice's opinion renders unintelligible the statutory definition of manslaughter, which is, causing "the death of another under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation or excuse." Utah Code Ann. § 76–5–205(1)(b) (1978). It is not possible to determine whether a defendant's mental or emotional disturbance is reasonably explained or excused without considering his "own peculiar mental processes." For example, a parent grief-stricken over the loss of a child may assault the killer and cause his death "under the influence of extreme ... emotional disturbance." The grief is the disturbance, and it may have a reasonable excuse. A person suffering from post-traumatic shock syndrome may likewise assault and cause the death of someone who approaches him in the street at night. His own mental processes cause him to see threat and danger where "reasonable" persons, persons not possessing his mental state, would not. The crime might nevertheless constitute manslaughter.

Grief and post-traumatic shock syndrome are only two examples of internal mental or emotional conditions that can cause emotional disturbance leading to violent actions. The emotional disturbance is not triggered by external stimuli, but by inter-

1. Instruction No. 37 told the jury:
 If you believe that the evidence establishes each and all of the essential elements of the offense beyond a reasonable doubt, you must find the defendant guilty of Criminal Homicide, Murder in the First Degree. On the other hand, if the evidence has failed to so establish one or more of said elements ... you must then consider the guilt or innocence of the defendant of the lesser included offense of Criminal Homicide, Murder in the Second Degree.
 Instruction No. 38 similarly instructed the jury members that they should consider manslaughter only if the evidence failed to establish second degree murder beyond a reasonable doubt.

nal mental states which may or may not have reasonable explanation or excuse[2] and which may or may not rise to the level necessary to sustain a diminished capacity defense. Other examples of subjective mental or emotional conditions which could and should be relevant to a manslaughter analysis are sleep deprivation, medication imbalance, severe anxiety (not amounting to a mental illness), and physical illness. These conditions may bring about emotional disturbance leading to loss of self-control —they are internal triggers, and they would be appropriate to a manslaughter finding under certain facts. It is improper in my view to preclude a jury from taking into account a defendant's "peculiar mental processes" when considering manslaughter.

Defendant Bishop claimed that his psychological defects, while not rising to the level of mental illness which would mitigate or obviate intent, nevertheless were sufficiently serious to create an emotional disturbance when he was faced with public exposure by his victims. This was a legitimate approach, and the trial judge properly permitted defendant to put on his evidence supporting this theory. The jury instruction language quoted above, however, would have effectively prevented the jury from considering the theory or the evidence and was therefore improper. Since the jury found first degree murder and never considered manslaughter, the issue is moot and the error harmless. I am afraid that the Chief Justice's opinion is needlessly making bad law on manslaughter.

*Sufficiency of the Aggravating Circumstances Evidence* (§ XII)

Because the record contains separate jury verdicts finding defendant guilty of the crime of aggravated kidnapping, which also constituted an element of capital homicide under section 76-5-202(1)(d), I concur in the treatment afforded this issue by the Chief Justice's opinion. I note, however, that I think it was improper for the trial court to enter separate convictions and sentences on the kidnapping charges in view of the use of these acts to aggravate the killings to capital murders. The same crime cannot be the predicate for two criminal convictions. *See* Utah Code Ann. § 76-1-402(3) (1978); *State v. Shaffer*, 725 P.2d 1301, 1312–14 (Utah 1986). Defendant has not raised this issue, and it is presumably of no import in view of this Court's sustaining the death penalty.

ZIMMERMAN, Justice: (concurring in the result).

I join the Chief Justice in affirming Arthur Gary Bishop's convictions and sentences. However, I cannot agree with the Chief Justice that, with one exception, Bishop's trial was error-free. The remainder of this opinion explains what errors I think were committed.[1] My ultimate conclusion is that all the errors in Bishop's trial were harmless. For that reason alone, I vote to affirm.

Before proceeding, however, I must observe that given the way the State chose to charge Bishop and to present its case, numerous complex and subtle legal questions were raised. To state that the prosecution or the trial judge may have erred in some particular does not reveal any fundamental flaw in the legal system; it only proves that prosecutors can be over-zealous and that judges are mortal. The crimes charged were of almost inconceivable enormity, and Bishop's guilt was plain. Yet we must not succumb to the temptation to ignore errors that occurred during trial. To do so would only do a disservice to those who must depend on our opinions for guidance in future cases. The ultimate test of a trial's fairness is not whether errors were committed, but whether the

---

**2.** I think it is this portion of the manslaughter statute that the trial court's instruction was really trying to address, since it seems clear to me that, however agitated Bishop's mental state due to his psychological deviation might have become, there could not be a "reasonable explanation or excuse" for killing under the influence of this disturbance.

**1.** Because two other justices join in this opinion with minor reservations, it expresses the view of the majority of the Court on most of the issues it addresses, with the exception of those issues specifically noted in the opinions of Associate Chief Justice Stewart and Justice Durham.

errors were sufficiently harmful to the defendant to require reversal.

My first point of disagreement with the Chief Justice relates to part IX of his opinion. On this point, I agree with Justice Stewart that the manslaughter instruction was erroneous but that the error was harmless.

Second, with respect to part X of the Chief Justice's opinion, I agree with the analysis in subpart XB that the trial court erred in admitting the three photographs of Graeme Cunningham's head injuries. *See State v. Lafferty,* 749 P.2d 1239, 1256–57 (Utah 1988); *State v. Cloud,* 722 P.2d 750, 752–54 (Utah 1986); *State v. Garcia,* 663 P.2d 60, 63–64 (Utah 1983); Utah R.Evid. 403. I also agree that any error committed in admitting these photographs was harmless. However, I find the Chief Justice's opinion lacking in its failure in subpart XA to address the merits of Bishop's claim that the trial court erred in admitting three other photographs, one each of the remains of Danny Davis, Graeme Cunningham, and Troy Ward, and in the consequent failure of subpart XB to consider whether the State should have stipulated to the contents of those photographs. We should not leave the impression that these photographs were all properly admitted.

Two of the photographs in question show officers removing the bodies of Troy Ward and Graeme Cunningham from a stream. The photographs are of small size and poor quality. In one picture, the corpse is on a litter and is covered with a cloth, except for the legs. It is viewed at some distance, and the most prominent feature in the photograph is the back of the officer carrying the litter. Nothing gruesome or gory is shown. The lighting is such that little can be distinguished besides the officer's back. The other photograph of a body being removed from the stream also shows only the lower legs. Again, nothing else distinguishable can be seen in the picture except for the back of an officer, and again, there is nothing gruesome or gory about the photograph. The third and final photograph shows Danny Davis's skeleton as it was being unearthed from its grave. The color photograph shows the top of the head, the torso, and the legs. No flesh is apparent on the bones, which are covered with remnants of the child's clothing. The view is from the top of the skull down and is unremarkable. The photograph is gruesome, but not markedly so.

In summary, only the photograph of Danny Davis's skeleton shows anything recognizable as a corpse and raises the concerns expressed in our decisions in *State v. Cloud,* 722 P.2d at 752–53, *State v. Garcia,* 663 P.2d at 64, and *State v. Wells,* 603 P.2d 810, 813 (Utah 1979). Because the two other photographs showing the bodies being removed from the stream do not fall within the gruesome-photographs-of-corpses category that we have subjected to particular scrutiny under rule 403, *see State v. Lafferty,* at 1256–57, and because they had little potential to unfairly prejudice Bishop, their admission probably was not erroneous under rule 403, even though they had little, if any, probative value.

On the other hand, the photograph of Danny Davis's skeletal remains presumptively should not have been admitted. *Id.* Although not unusually gruesome, it certainly did have potential to prejudice the jury unfairly against Bishop. The next question is the probativeness of this picture. How essential was it to the State's case? *See id.; State v. Cloud,* 722 P.2d at 753 (citing *State v. Garcia,* 663 P.2d at 64). The answer is that it was in no way essential to the State's case. In fact, it is hard to imagine that the photograph was of any assistance in proving the elements of the crime. It did not show the crime scene, nor did it illustrate any issue contested by the parties. It does not show that the boy's death was brought about by criminal agency. Therefore, the photograph of Danny Davis's skeleton should have been excluded. Because I conclude that the photograph of Danny Davis's skeleton should not have been admitted, I would hold that the State should have either done without this photograph or it should have stipulated with the defense as to the relevant facts shown. *See* part XB of the Chief Justice's opinion. As noted at the end of this opinion, however, I find the error committed in

connection with the admission of the photograph of Danny Davis's skeleton to have been harmless under the unique facts of this case.

My third point of disagreement with the Chief Justice relates to part XII of his opinion. For the reasons set out in Justice Durham's opinion in *State v. Tillman*, 750 P.2d 546, 585–88 (1987), I find merit in Bishop's claim that the jury was not properly instructed as to the need for unanimity on each element of the charge, including the specific aggravating circumstances charged. However, because the jury did return unanimous verdicts on the five separate charges of aggravated kidnapping, which were also charged as aggravating circumstances under the murder counts, the failure to instruct properly on unanimity was harmless.

My fourth and final point of disagreement concerns part XIV of the Chief Justice's opinion. He would hold that the trial court committed no error in permitting six adolescent boys to testify during the guilt phase of the trial regarding sexual improprieties the defendant had engaged in with them. The purported basis for the introduction of this testimony was section 76–5-404.1(3)(g) of the Code, under which Bishop was charged with sexually abusing Graeme Cunningham. That section provides for enhanced penalties when "[t]he *convicted person* committed more than five separate offenses under this section...." Utah Code Ann. § 76–5-404.1(3)(g) (Supp.1983) (emphasis added). The statute was amended in 1984, after the abuse of Graeme Cunningham and after Bishop's prosecution had begun, but before the actual trial. The 1984 version substituted "the accused" for "the convicted person." However, as the Chief Justice notes, Bishop's case was handled as though the 1983 version governed.

Bishop argues that the trial court misapplied the 1983 version of the statute. Read properly, he contends, the statute required the jury to determine whether he was guilty of sexually abusing Graeme Cunningham before the six boys were allowed

to give evidence relevant only to the propriety of an enhanced sentence. Alternatively, Bishop contends that if the statute was correctly construed and applied, then it is unconstitutional because it denied him due process of law. Specifically, if proof of the underlying charge and proof of the enhancing factors are put before the jury at the same time, the presumption of innocence will be undermined and a fair trial will be impossible; the jury will tend to convict because the defendant is a bad person who has committed other acts of abuse, not because the evidence proves he committed the particular crime charged.

On appeal, the State initially agreed that the trial court had misconstrued the 1983 version of the statute and that evidence of the other offenses should not have been introduced before the jury had determined that Bishop was guilty of the underlying sexual abuse charge involving Graeme Cunningham. However, in a supplemental brief the State then retracted this concession, arguing that the trial court properly construed the 1983 version or, alternatively, that the 1984 version should have been used and under its "accused" language, the trial court's procedure was proper. The State also advanced an alternative ground for the introduction of the testimony, arguing that it tended to prove that Bishop's motive for the killings was to prevent the victims' reporting his activities to the police.

The Chief Justice quite properly concludes that there is no merit to the State's contention that the 1984 statute governs here; the issue must be resolved under the 1983 version alone. However, he then rejects Bishop's claims. The Chief Justice concludes that the 1983 version of section 76–5-404.1(3)(g) should be read to conform to the 1984 amendments and that under the amendments, simultaneous proof of the underlying crime and the enhancing circumstances is permitted. In response to Bishop's contention that to so proceed denies due process, the Chief Justice reasons that the legislature has free rein to define the elements of a crime; because it has defined a crime qualifying for enhanced punishment by making proof of five other crimes

one of the elements, Bishop cannot complain.

Although I agree with the Chief Justice that the 1983 version of the statute applies to this case, I agree with Bishop and the State's initial brief that the 1983 version of section 76–5–404.1(3)(g) should not be read to permit the order of proof permitted by the trial court. My reasons for this conclusion are several. First, the plain language of the 1983 version appears to contemplate a bifurcated procedure in which guilt of the underlying charge must first be determined; only after the defendant is found guilty can the jury decide whether the "convicted person" has committed more than five other similar offenses. If the legislature had not intended a bifurcated procedure, it is hard to understand why it used the term "convicted person" in the statute.

Second, the procedure permitted by the interpretation the Chief Justice gives the statute is inconsistent with fundamental evidentiary principles that pervade our law, principles that can rise to the level of constitutional protections. There is no basis for concluding that the legislature consciously intended to contravene these principles when it passed section 76–5–404.1. Finally, the interpretation given the 1983 version of section 76–5–404.1(3)(g) by the trial court almost certainly results in a denial of due process under article I, section 7 of the Utah Constitution. Utah Const. art. I, § 7. It is a settled canon of statutory construction that, when possible, a statute should be interpreted so as to avoid constitutional infirmities. *Greaves v. State*, 528 P.2d 805, 806–07 (Utah 1974); 2A N. Singer, *Sutherland on Statutory Construction* § 45.11 (rev. 4th ed. 1984). This due process problem can be avoided by the simple expedient of reading the 1983 version of section 76–5–404.1(3)(g) as written.

A number of sources indicate that permitting proof during the guilt phase of crimes unrelated to that for which the defendant is on trial is inconsistent with fundamental notions of fairness deeply embedded in the law. The law has long been hostile to the introduction of bad character evidence solely for the purpose of proving guilt on a criminal charge. As early as 1896, this Court expressed that hostility when it stated: "The general rule is that one crime cannot be offered to prove a similar offense committed against another person at another time." *People of the Territory of Utah v. Coughlin*, 13 Utah 58, 65, 44 P. 94, 95 (1896); *accord Boyd v. United States*, 142 U.S. 450, 454–58, 12 S.Ct. 292, 294–95, 35 L.Ed. 1077 (1891). In *Michelson v. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), the United States Supreme Court explained that this rule is necessary to prevent unfair prejudice:

> Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Not that the law invests the defendant with a presumption of good character, ... but it simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief. The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.

*Id.* at 475–76, 69 S.Ct. at 218–19 (citations omitted). Justice Stewart expressed the same sentiments in his scholarly concurrence in *State v. Forsyth*, 641 P.2d 1172, 1177–79 (Utah 1982) (Stewart, J., concurring) (cited with approval in *State v. Saunders*, 699 P.2d 738, 741 n. 17 (Utah 1985),

and followed without citation in *State v. Holder*, 694 P.2d 583, 584 (Utah 1984)).

The present Utah Rules of Evidence embody this long-standing common law approach to evidence of prior crimes or bad character. Rule 404(a) states the general rule by forbidding admission of "[e]vidence of a person's character or a [character] trait ... for the purpose of proving ... [action] in conformity therewith on a particular occasion." Utah R.Evid. 404(a). Rule 404(a) sets forth several narrow exceptions to this rule, but none are relevant in this case. Rule 404(b), which is identical to Federal Rule of Evidence 404(b), also reflects the law's cautious approach to such evidence. It permits introduction of evidence of prior crimes or bad acts to prove certain facts relevant to pending charges, but only if the evidence is admissible under rule 403, *i.e.,* only if the danger of unfair prejudice does not outweigh the probative value of the evidence.[2] *See* Fed.R.Evid. 404 advisory committee note to subdivision (b) (cited by Utah R.Evid. 404, advisory committee note); Utah R.Evid. 404(b), 403; Fed.R.Evid. 404(b), 403.

This Court's decisions have consistently recognized that an accused is almost certainly prejudiced unfairly when evidence of unrelated crimes or bad acts is introduced because of "the tendency of a fact finder to convict the accused because of bad character rather than because he [or she] is shown to be guilty of the offenses charged." *State v. Saunders*, 699 P.2d at 741. For this reason, "such evidence is presumed prejudicial and, absent a reason for the admission of the evidence other than to show criminal disposition, the evidence is excluded." *Id.*

This hostility to bad character evidence is manifested in our cases imposing a requirement that trial courts make every effort to avoid the introduction of such evidence at a trial on an unrelated criminal charge. For example, when the prosecution joins two or more charges, but evidence of each crime would not otherwise be admissible at a trial for the other, we require that the charges be severed for trial. *See State v. Long*, 721 P.2d 483, 495 (Utah 1986) (suggesting that on retrial charges of possession of a dangerous weapon by a restricted person should be severed from charges of aggravated assault and attempted murder because of "unwarranted prejudice inherent in informing the jury that a defendant is a convicted felon"); *State v. Tarafa*, 720 P.2d 1368, 1370 (Utah 1986) (joint trial of theft charges arising out of three separate but similar incidents held denial of due process; remanded for separate trials); *State v. Saunders*, 699 P.2d at 741 (joint trial of charge of possession of a firearm by restricted person with charges of burglary and theft held unduly prejudicial; remanded for separate trials); *State v. McCumber*, 622 P.2d 353, 356 (Utah 1980) (joint trial on aggravated sexual assault and similar charges arising out of unrelated criminal episodes held a denial of due process; remanded for separate trials); *State v. Gotfrey*, 598 P.2d 1325, 1328 (Utah 1979) (joint trial of one sodomy and two rape charges arising out of three separate instances denied fair trial; remanded for separate trials).

In the same vein, we have required that evidence of other crimes or bad acts be excluded whenever possible because of its great potential for unfair prejudice. *See State v. Holder*, 694 P.2d at 585 (admission of evidence of robbery at trial for theft of car held abuse of discretion under rule 45 (predecessor to rule 403) because potential for unfair prejudice outweighed probative value; remanded for new trial).

In the present case, the only justification for admitting in the guilt phase evidence of six other instances of sexual abuse is that section 76–5–404.1(3)(g) made commission of more than five such acts an element that must be proven before a convicted person is eligible for an enhanced penalty. The Chief Justice concludes that this section effectively authorized simultaneous admis-

---

**2.** Rule 609(a) also embodies the law's general hostility to evidence of bad acts or bad character offered to prove guilt. It provides that evidence of a prior conviction may not be admitted to impeach a witness unless "the court determines that the probative value of admitting this evidence outweighs its prejudicial effect...." Utah R.Evid. 609(a).

sion of evidence relevant to an enhanced sentence and evidence of guilt of the underlying charge. Absent such authorization, rule 404(a) would have required exclusion of the evidence because it was not part of the criminal episode from which the underlying sexual abuse charge arose and it did not satisfy any of the exceptions listed in rule 404(a) or (b).[3] Yet the Chief Justice, in seeking the appropriate construction of section 76–5–404.1(3)(g), does not appear to have considered the deep and long-standing hostility of Utah law to such a use of evidence of unrelated criminal activity. I think that in the absence of a clear indication that the legislature intended a different result for a good reason, we should not interpret a statute to reach such a result. Therefore, I reject the Chief Justice's interpretation of the 1983 version of section 76–5–404.1(3)(g).

There is another reason for not reading the statute as the Chief Justice suggests. Such a reading renders the statute unconstitutional. Language in some of our cases, such as *State v. Saunders* and *State v. Tarafa*, plainly states that permitting the jury to consider otherwise inadmissible bad character evidence for the sole purpose of determining guilt denies a defendant due process in violation of the state and federal

constitutions. *See, e.g. Tarafa,* 720 P.2d at 1370; *Saunders,* 699 P.2d at 741–42; *State v. McCumber,* 622 P.2d at 356.[4] That would be the precise effect of permitting section 76–5–404.1 to be read as it was by the trial court.

As indicated above, Bishop has a fundamental interest in having his guilt on the underlying charge of sexual abuse determined in an atmosphere free from the almost overwhelming prejudice that arises when evidence of more than five other unrelated instances of sexual abuse is introduced during the guilt phase. On the other hand, the legislature has a legitimate interest in providing for enhanced punishment for those with a history of criminal conduct. *See, e.g., State v. Bailey,* 712 P.2d 281, 286–87 (Utah 1985). One expression of that interest is section 76–5–404.1(3)(g). But pursuit of that legitimate interest in no way requires that evidence relevant to enhanced punishment be introduced in the guilt phase of a trial on the underlying charge, where it is almost certain to unfairly prejudice that trial.

The Chief Justice suggests that the admission of what would otherwise be inadmissible bad character evidence is permissible in this case simply because the legislature has chosen not only to make evidence

---

**3.** Utah Rule of Evidence 404(b) forbids the admission of evidence of "other crimes, wrongs or acts ... to prove the character of a person in order to show that he acted in conformity therewith." However, it does permit the introduction of such evidence for "other purposes," including "proof of motive." Utah R.Evid. 404(b). The State relies on this exception to justify the admission of the six boys' testimony, arguing that it tended to show that Bishop's motive for the killings was to prevent disclosure of his activities. This argument must fail. The advisory committee's note to Utah Rule of Evidence 404 cites the advisory committee's note to the identical federal rule, which states that relevancy alone does not make evidence admissible under one of the exceptions; the trial court still must find that the potential for unfair prejudice does not substantially outweigh the probative value. Fed.R.Evid. 404(b) advisory committee note.

In *State v. Holder,* 694 P.2d 583, 584 (Utah 1984), this Court made it clear that such a determination must be made under the Utah rule as well. Under the facts of the present case, that analysis would result in the exclusion

of the evidence. The testimony of the boys was essentially cumulative of evidence that had already been admitted from Bishop's confession and from one witness. Therefore, its probative value as to his motive for the killings was minimal, an important factor in making the admissibility determination. *See* Fed.R.Evid. 404(b) advisory committee note. On the other hand, the potential for unfair prejudice was enormous, raising a real possibility that the jury would convict on the basis of the other uncharged crimes, rather than the one actually charged. Therefore, the evidence did not qualify for admission under the rule 404(b) exceptions.

**4.** Most of our other cases do not reach the constitutional question. They simply hold that when bad character evidence is admitted as an element of a crime, the trial court should make every effort to insulate the jury from hearing such evidence while considering other unrelated charges. *See, e.g., State v. Long,* 721 P.2d 483, 495 (Utah 1986); *State v. Gotfrey,* 598 P.2d 1325, 1328 (Utah 1979). These decisions certainly do not contradict those grounded on statements regarding constitutionality.

of other crimes a prerequisite for eligibility for an enhanced penalty, but also to permit eligibility to be determined in the guilt phase of the trial. As noted, I do not agree that the legislature has sanctioned such a procedure. But even if it had, the due process question remains: Can the legislature require that unrelated factual questions be determined in one proceeding when such an aggregation of issues is not necessary to accomplish a legitimate legislative objective and when it unfairly prejudices the accused? I think not, consistent with the due process clause of article I, section 7 of the Utah Constitution and our decisions in *Tarafa, Saunders,* and *McCumber,* among others. Here, there is no need to combine the question of guilt and enhancement in one proceeding because each question is independent of the other and could readily be determined separately. And no other legitimate legislative objective requiring joint determination of these issues has been suggested.[5] Therefore, I conclude that the procedure followed by the trial court operated to deny Bishop his due process rights under the Utah Constitution. Because we should interpret a statute to avoid constitutional infirmities, this analysis also supports my conclusion that section 76–5–404.1(3)(g) should not be read to permit such an aggregation of issues and evidence.

How then is a court to proceed, consistent with due process, to determine the questions of guilt and eligibility for enhancement under section 76–5–404.1? The

legitimate interests of the State and the accused can easily be accommodated through a bifurcated procedure. When the underlying crime is charged, and enhancing circumstances involving other crimes or bad acts factually unrelated to the underlying criminal episode are also charged for the purpose of increasing the severity of the punishment for the underlying crime, the trial court must divide the trial into separate segments. First, evidence regarding the underlying crime should be admitted, and the jury should be asked to determine guilt or innocence based on that evidence alone. Second, if a guilty verdict is returned on the underlying charge, then evidence regarding the enhancing circumstances should be heard by the same jury for the purpose of determining whether those circumstances have been proven beyond a reasonable doubt.[6] Only if the jury finds that the circumstances have been proven would the "convicted person" receive the enhanced penalty.[7]

I recognize that the 1984 version of section 76–5–404.1(3)(g) deleted the reference to the "convicted person" and therefore does not lend itself readily to the interpretation I find appropriate for the 1983 version. However, as the Chief Justice observes, the legislature did not intend the 1984 amendments to change the 1983 version. And the 1984 version, if construed in accord with the Chief Justice's interpretation of the 1983 version, would be subject to the same constitutional infirmities. For

5. I can conceive of no constitutionally legitimate interest that could be vindicated by a statute which permitted the introduction of evidence of unrelated crimes during the guilt phase solely for the purpose of proving the defendant guilty of the underlying charge.

6. The Chief Justice's opinion justifies the evidentiary procedure used in the trial court as protecting a defendant's interests by ensuring that the enhancing factors will be proven to the jury beyond a reasonable doubt and under the rules of evidence. However, those protections are better provided by the required bifurcated procedure, which also eliminates the unfair prejudice to a defendant inherent in the procedure followed by the trial court. *Cf. State v. Lafferty,* 749 P.2d 1239, 1260 & n. 16 (Utah 1988) (adopting procedural requirements to ensure that other violent crimes cannot serve as aggravating

factors in the penalty phase of a capital case, unless they have been proven beyond a reasonable doubt).

7. If the facts that support the enhancing charge are part of the criminal episode out of which the basic charge arose, whether measures should be taken to separate proof of the underlying charge from proof of the enhancing facts is a matter left to the trial court's discretion. Of course, the trial court should exercise its discretion in a manner consistent with our strong concerns about unnecessarily tainting the finder of fact with evidence of other bad acts. *See State v. Long,* 721 P.2d at 495; *State v. Tarafa,* 720 P.2d 1368, 1370 (Utah 1986); *State v. Saunders,* 699 P.2d 738, 741–42 (Utah 1985). However, when there is no such relationship between the basic charge and the enhancing facts, bifurcation is mandatory.

these reasons, I would construe the 1984 version as also requiring a bifurcated procedure.

It is worth observing that, as a general matter, requiring that trials proceed in the bifurcated fashion described above is entirely within our inherent power to supervise the courts. It is especially appropriate that we exercise that supervisory power to require certain procedures when fundamental values are threatened by other modes of proceeding. *See, e.g., State v. Lafferty,* at 1260 (imposing requirement of instructions and written findings on proof of aggravating circumstances in penalty phase of capital case); *Smith v. Smith,* 726 P.2d 423, 425–26 (Utah 1986) (imposing requirement of detailed findings and reasons for decree awarding custody); *State v. Long,* 721 P.2d at 492 (imposing requirement for eyewitness identification instruction); *State in re Clatterbuck,* 700 P.2d 1076, 1081 (Utah 1985) (imposing requirement of detailed findings and reasons for certifying juveniles to stand trial as adults).[8]

The final and overarching question presented by my conclusion that several errors were committed in the trial of this case is whether the errors were harmless. Two standards for determining the "harmlessness" of an error may apply to this case. The first is the standard set by our rules to determine whether a particular error warrants reversal. The second is the standard fixed by the United States Supreme Court for violations of the federal constitution. The standard applicable under our rules is settled. Rule 30 of the Utah Rules of Criminal Procedure states, "Any error, defect, irregularity or variance which does not affect the substantial rights

of a party shall be disregarded." Utah R.Crim.P. 30(a). A slightly different wording is used in Utah Rule of Evidence 103, which also applies in criminal proceedings. That rule provides, "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected...." Utah R.Evid. 103(a). We consider these two rules to set substantively identical standards. *State v. Hackford,* 737 P.2d 200, 204 n. 1 (Utah 1987). *Compare State v. Knight,* 734 P.2d 913, 919–20 (Utah 1987), *with State v. Rammel,* 721 P.2d 498, 500 (Utah 1986). An error requires reversal under this standard if our "confidence in the outcome" of a particular trial is "eroded." *Knight,* 734 P.2d at 920. Only when confidence in the outcome is eroded can we say that, absent the error, there is a reasonable likelihood that the outcome would have been more favorable to the defendant. *Id.* at 919–20.

Under this standard, I have absolutely no difficulty in concluding that all the errors discussed above were harmless. The Graeme Cunningham photographs were very gruesome and had significant power to inflame the jury and unfairly prejudice Bishop. The testimony of the six boys had a strong tendency to convince the jurors that Bishop is a loathsome, confirmed child abuser and to deprive them of the ability to appraise the evidence against him fairly. In any other situation, the admission of these items of evidence almost certainly would mandate reversal. This case, however, is unusual. Bishop made a detailed confession. A reading of that confession leaves me with a firm and unshakeable conviction that the verdicts on the five

---

**8.** The legislature has also defined the elements of certain other crimes to include unrelated bad acts solely for the purpose of enhancing punishment. For example, a knowing or intentional killing not committed under any of the circumstances listed in section 76–5–202 of the Code constitutes second degree murder and is punishable by imprisonment for five years to life. Utah Code Ann. §§ 76–5–203(1)(a), 76–3–203(1) (Supp.1987). However, if a knowing or intentional killing is committed by one who has previously been convicted of "first or second degree murder or of a felony involving the use or threat of violence to a person" or by one

"under a sentence of life imprisonment or a sentence of death," then that killing may be punishable by death. Utah Code Ann. § 76–5–202(1)(h), (p) (Supp.1987). The introduction in the guilt phase of a murder trial of evidence of a prior murder conviction would raise all the concerns presented in this case. The bifurcated procedures described here would be equally appropriate in the trial of such cases. *Cf. State v. Lafferty,* at 1260 (establishing procedures for admitting in the penalty phase of a capital trial evidence of other violent crimes for which convictions have not been obtained).

counts of capital homicide, the five counts of aggravated kidnapping, and the count of sexual abuse of a child would have been the same even if the trial court had kept out the objectionable photographs and had prevented the six boys from testifying during the guilt phase. I am similarly convinced that the result in the penalty phase would have been the same in the absence of these errors.

An additional word is necessary with respect to the sexual abuse of a child charge. If there had been any substantial conflict in the evidence supporting the charge of sexually abusing Graeme Cunningham, I would conclude that the introduction of the testimony of the six boys before the jury had determined guilt on the sexual abuse charge would have been harmful error and would require reversal. However, the evidence that the Cunningham boy was induced by Bishop to pose for sexually explicit nude photographs came directly from his confession and was uncontested. Because I agree with the Chief Justice that this evidence supports a conviction for sexual abuse of a child, I conclude that the testimony of the other six boys was harmless error under the "erosion of confidence" standard.

The second or federal constitutional harmless error standard is also pertinent in this case. Bishop raises several claims based on the state and federal constitutions in challenging the admission of the testimony of the six boys during the guilt phase of the trial on the sexual abuse charge. As noted above, there is no need to reach the merits of Bishop's federal due process contentions because I find that the trial court's mode of proceeding was contrary to the statute's language and violated the Utah Constitution's due process clause, article I, section 7. However, the fact that I find error in the trial court's procedure without reaching Bishop's federal constitutional claims does not permit me to ignore those claims unless the standard used to determine the harmfulness of state constitutional violations is at least as strict as the federal constitutional error standard. If it is not as strict, it is possible that a state constitutional error could be found to be harmless when an analogous federal constitutional error would not.

This court has yet to squarely decide whether the harmless error standard applicable to violations of the state constitution is the erosion of confidence standard or the stricter federal "harmless beyond a reasonable doubt" standard. *State v. Hackford*, 737 P.2d at 204–05 & n. 3. And there is no reason to reach that issue today. It is sufficient to assume, *arguendo*, that Bishop's claims attacking the unitary procedure which permitted the introduction of the six boys' testimony during the guilt phase would be resolved in his favor under the federal constitution just as they have been under the Utah constitution and to analyze the errors under the federal harmless error standard. If the errors are still found to be harmless, there is no need to decide the merits of Bishop's federal claims because they would not affect the outcome.

As indicated in *Hackford*, the current articulation of the federal constitutional harmless error standard requires a reversal unless "the overwhelming evidence" shows that the result would have been no different in the absence of the error. 737 P.2d at 205 n. 3; *see State v. Tillman*, at 555. In the present case, I find this standard satisfied with respect to all of the charges. Again, a reading of the confession is sufficient to convince me, beyond a reasonable doubt, that the jury would have convicted Bishop of all charges whether or not the six boys had been permitted to testify during the guilt phase. Despite all the prosecution's questionable efforts to enliven the trial with grisly photographs, bits of clothing from the skeletons, and emotional testimony from the victims' relatives, the cold words of the confession, revealing crimes of singular monstrosity, remain the most compelling evidence against Bishop and make it inconceivable that he would have been acquitted on any of the charges.

My conclusion with respect to the sentencing phase is the same. Even if the bifurcated procedure that I outline had been followed, the jury would have heard the boys' testimony before it decided to impose the death sentences. Had it not

been admitted to enhance the penalty for the sexual abuse of a child charge, the jury could have considered it as evidence of aggravating circumstances to be weighed in deciding whether to impose the death sentences. *See* Utah Code Ann. §§ 76-3-207(2), (3) (Supp.1987); *State v. Lafferty,* 749 P.2d at 1259-60 (allowing other violent crimes to serve as aggravating circumstances if proven beyond a reasonable doubt); *cf. Gregg v. Georgia,* 428 U.S. 153, 206-07, 96 S.Ct. 2909, 2940-41, 49 L.Ed.2d 859 (1976) (Georgia statute permitting jury *to consider any aggravating circumstance* upheld); *Harris v. Pulley,* 692 F.2d 1189, 1194 (9th Cir.1982) *rev'd on other grounds,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) (California statute permitting jury to consider non-statutory aggravating circumstances upheld). But even if this testimony had not been admitted, the overwhelming weight of the other evidence leads me to conclude beyond any doubt that the jury would have imposed five death sentences on Bishop.

For the foregoing reasons, I conclude that the errors were harmless under any applicable standard. The convictions and sentences should be affirmed.